UNITED STATES of America,
Plaintiff-Appellee,

v.

Richard Colby PARR and Vincent
Rendaro, Defendants-Appellants.

No. 82–5336.

United States Court of Appeals,
Eleventh Circuit.

Sept. 19, 1983.

Mark P. Bryan, Federal Public Defender, Tampa, Fla. (Court-appointed), for Richard Colby Parr.

James B. Murphy, Jr., Raymond T. Elligett, Jr., Shackleford, Farrior, Stallings & Evans, P.A. (Court-appointed), Tampa, Fla., for Vincent Rendaro.

Lynn H. Cole, Asst. U.S. Atty., Tampa, Fla., John E. Steele, Asst. U.S. Atty., Jacksonville, Fla., for plaintiff-appellee.

Before RONEY and KRAVITCH, Circuit Judges, and TUTTLE, Senior Circuit Judge.

KRAVITCH, Circuit Judge:

Vincent Rendaro and Richard Colby Parr appeal their convictions for violation of substantive counterfeiting statutes and conspiracy to violate the same, 18 U.S.C. §§ 371, 471, 473, 2 (Parr and Rendaro), 472 (Parr only) and 474 (Rendaro only).[1] Each was convicted on three counts of the indict-

---

1. The indictment reads as follows:

COUNT I

From on or about September 1, 1981, to on or about November 9, 1981, in the Middle District of Florida,

RICHARD COLBY PARR
DONNA OLES
and
VINCENT RENDARO

ment. All three convictions of Appellant Rendaro are affirmed. As to Parr, conviction on one count is reversed, the other two affirmed.

*Factual Scenerio*

On October 9, 1981 a confidential informant turned over to two Special Agents of the United States Secret Service a counterfeit ten dollar Federal Reserve Note. Special Agent Mike McMillan was thereafter assigned to investigate, in an undercover capacity, the source of the note. On October 15 McMillan, wearing a concealed tape recorder and using an assumed name, went

defendants herein, did willfully, knowingly and intentionally conspire, combine, confederate and agree to together and with each other to do the following:

(1) To falsely make, forge, counterfeit and alter obligations and securities of the United States, with the intent to defraud, in violation of Title 18, United States Code, Section 471.

(2) To knowingly buy, sell, exchange, transfer, receive and deliver false, forged and counterfeited obligations and securities of the United States, with the intent that the same be passed, published, and used as true and genuine, in violation of Title 18, United States Code, Section 473.

To effect the objects of the conspiracy, the defendants committed various overt acts in the Middle District of Florida, including, but not limited to the following:

(1) On or about October· 19, 1981, Richard Colby Parr possessed and concealed sixteen (16) counterfeit ten dollar Federal Reserve Notes.

(2) On or about October 21, 1981, in the Middle District of Florida, Richard Colby Parr drove to the Starlight Lounge located at 9700 N. Nebraska, Tampa, Florida, and met with Vincent Rendaro.

(3) On or about October 21, 1981, Vincent Rendaro, in Tampa, Florida, gave a Special Agent of the United States Secret Service a counterfeit ten dollar Federal Reserve Note.

(4) On or about October 21, 1981, in Tampa, Florida, Donna Oles traveled to Hour Quick Print Shop where she met with Richard Colby Parr.

All in violation of Title 18, United States Code, Section 371.

COUNT II

On or about October 19, 1981, in the Middle District of Florida,

RICHARD COLBY PARR

knowingly, unlawfully, and with the intent to defraud, did conceal and keep in his possession, falsely made, forged, counterfeited and altered obligations and securities of the United States, that is, sixteen (16) counterfeit ten dollar Federal Reserve Notes, each bearing check letter D, face plate number 383, back plate number 457, series 1977A, drawn on the Federal Reserve Bank of Richmond, and the defendant then knew the said ten dollar Federal Reserve Notes were falsely made, forged, counterfeited and altered, all in violation of Title 18, United States Code, Section 472.

COUNT III

On or about October 20, 1981, in the Middle District of Florida,

RICHARD COLBY PARR

and

VINCENT RENDARO

with the intent to defraud, did falsely make, forge, counterfeit and alter obligations and securities of the United States, that is, 1,115 counterfeit ten dollar Federal Reserve Notes, each bearing check letter B, face plate number 388, back plate number 420, series 1977A, drawn on the Federal Reserve Bank of Boston, all in violation of Title 18, United States Code, Sections 471 and 2.

On or about October 21, 1981, in the Middle District of Florida,

RICHARD COLBY PARR

and

VINCENT RENDARO

with the intent to defraud, did falsely make, forge, counterfeit and alter obligations and securities of the United States, that is, 7,682 partially completed counterfeit ten dollar Federal Reserve Notes, each bearing check letter B, face plate number 334, series 1977, drawn on the Federal Reserve Bank of Philadelphia, all in violation of Title 18, United States Code, Sections 471 and 2.

COUNT V

On or about October 21, 1981, in the Middle District of Florida,

VINCENT RENDARO

with the intent to sell and otherwise use, did have in his possession and custody, unlawfully and without authority of the Secretary of the Treasury, an obligation and security made and executed, in whole and in part, after the similitude of an obligation and security issued under the authority of the United States, that is, a ten dollar Federal Reserve Note bearing check letter B, face plate number 388, back plate number 420, series 1977A, drawn on the Federal Reserve Bank of Boston, all in violation of Title 18, United States Code, Section 474.

A TRUE BILL

/s/ Ralph Heath

FOREMAN

GARY L. BETZ

UNITED STATES ATTORNEY

BY: _____

LYNN H. COLE

Assistant United States Attorney

Rendaro was convicted on Counts I, III, and V. Parr on Counts I, II and III. Count IV appears, at some time, to have been dropped from the indictment.

with the informant to the Starlight Lounge ("the Lounge") in Tampa, Florida. There the informant introduced McMillan to Appellant Rendaro, the manager of the Lounge. The tape recording of this and other meetings in the course of the next week, and the testimony of McMillan, supply evidence that Rendaro had given the note to the informant, Rendaro having received it from Richard Parr. McMillan represented himself as desirous of purchasing counterfeit money. Rendaro agreed to use his efforts to contact "the printer," Rich Parr, and encourage him to produce more counterfeit. McMillan and Rendaro met once more on the 15th, again on the 16th, and engaged in several telephone conversations between the 16th and the 21st. In these conversations Rendaro conveyed varying degrees of optimism or pessimism that Parr would print the money. On October 21, McMillan telephoned Rendaro and learned that $107,000 worth of the money had been printed. Both Rendaro and McMillan expressed surprise that the money had been printed at that time. McMillan then traveled to the Lounge where Rendaro gave him a sample ten dollar bill.[2] Rendaro and McMillan agreed on the price of $20,000 for the bills and planned for McMillan to call Rendaro later that day to discuss final arrangements.

Soon thereafter McMillan observed Parr drive up to the Starlight Lounge in a van, go into the Lounge, come out with Rendaro, sit in the front of the van, and look at something in the back of the van. A few hours later McMillan again called Rendaro. Rendaro said, in part, "Man, I saw that shit they are selling. Three big bundles of it.... 10:00, he'll be right here with it. I saw it this afternoon. Right after you left, he came by and showed me.... There is no problem though. We'll just exchange it all and get it done. [McMillan responded: "All right"]. In fact, whenever you are, uh, whenever things go well for you, you can get ahold of me and we can always hit it again."

Unbeknownst to Rendaro at this time, in the early morning hours of October 19 the Tampa Fire Department had responded to a fire at the residence of Richard Parr. After the fire in a laundry room adjacent to the kitchen of Parr's residence was extinguished, the fire fighters engaged in a procedure identified as "Salvage and Overhaul," a phase in which the fire fighters look for spot fires to insure all are extinguished, for information revealing the identity of the owner and for salvagable valuables in order to protect them from vandals. During this phase, Fire Fighter Stone went into the kitchen of the house, took down an opaque sugar bowl from a shelf above the sink, looked into the uncovered container and inside observed currency, namely sixteen ten dollar bills. He took the bowl and the currency, intending to salvage it as a valuable, and turned it over to Fire Inspector Burke. While counting the money for his own inventory, the inspector noticed all the bills had the same serial number and concluded the money was counterfeit. At that point he stopped counting and called the police. Officer Burkett of the Tampa Police Department responded to the call, testifying that he was called because "a large amount of money had been found and they wanted me to take custody of it."

Upon his arrival, Burkett, with Burke and another fire fighter as his witnesses, counted the money. He immediately detected that "it did not appear to be real money," as all bills had the same serial number and "there was something different about" the feel and color of the bills. The police officer concluded the money was counterfeit and secured it in his vehicle.

Parr appeared on the scene approximately one-quarter to one-half hour later. Officer Burkett approached him with the counterfeit bills, identified himself, and informed Parr he was investigating him as a suspect for the possession of counterfeit money. Officer Burkett testified that at

2. This ten dollar bill is the subject of Count V of the indictment, conviction under which Rendaro appeals.

that time he read Parr his *Miranda* rights. Parr then stated to Burkett that the money was not his. When told it had been found in a tea kettle in his kitchen he said the tea kettle belonged to his wife [3] and he had no knowledge of the kettle or the money.

Parr worked for Donna Oles at the Hour Quick Print Shop and had a personal relationship with her. Oles testified at trial that Parr had pressured her to help him produce counterfeit money. They printed twenty such bills in mid-to-late September. In early October Rendaro began contacting her to encourage her to allow Parr to use her print shop to produce more counterfeit. Oles resisted for a time but then, in mid-October, yielded to Parr's pleas and assisted Parr in printing approximately 1,115 counterfeit ten dollar bills.

On November 18, 1981, Parr and Rendaro were charged in a single indictment of conspiracy (Count One) and substantive counterfeiting violations (Counts 2, 3, 4—Parr; Counts 3, 4, 5—Rendaro). Oles also was charged in Count One, the conspiracy count, and pleaded guilty. Parr and Rendaro pleaded not guilty and were tried jointly. Both were convicted of conspiracy and two substantive counts of violating the federal conspiracy laws.

*Appellant Rendaro*

### I. *Entrapment Instruction*

Rendaro contends that the trial court erred in refusing to instruct the jury as to an entrapment defense.

■ The entrapment defense provides a basis for acquittal where the government implants in the mind of an innocent person the disposition to commit the committed criminal acts. *United States v. Reyes,* 645 F.2d 285, 286 (5th Cir.1981).[4] "To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." *Sherman v.*

*United States,* 356 U.S. 369, 372, 78 S.Ct. 819, 821, 2 L.Ed.2d 848 (1958). That line is drawn by assessing the defendant's predisposition or lack of predisposition to commit the crime. Lack of predisposition is the principal element of the entrapment defense. *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); *United States v. Reyes,* 645 F.2d at 286. The fact that governmental agents afford an opportunity to commit an offense that the defendant is predisposed to commit does not constitute entrapment. *Id.; United States v. Russell,* 411 U.S. at 428–29, 93 S.Ct. at 1640–41; *Sherman v. United States,* 356 U.S. at 372, 78 S.Ct. at 820.

■ Entrapment is an affirmative defense, evidence of which must be presented before the issue properly is raised. *United States v. Humphrey,* 670 F.2d 153, 155 (11th Cir.), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2305, 73 L.Ed.2d 1307 (1982). The defendant has the initial burden of producing evidence, or of pointing to substantial evidence injected into the case by the government in presenting its proof, *see United States v. Reyes,* 645 F.2d at 286–87; *Sears v. United States,* 343 F.2d 139, 143 (5th Cir.1965), showing government involvement or inducement. *Id.; United States v. Reyes,* 645 F.2d at 287; *United States v. Hill,* 626 F.2d 1301, 1303–04 (5th Cir.1980).

■ The sufficiency of the evidence proffered to raise the defense of entrapment is a question of law for the court in the first instance. *United States v. Reyes,* 645 F.2d at 287. Only after the defendant has sustained his initial burden does the issue of entrapment become a question of fact for the jury. *Id.; United States v. Wolffs,* 594 F.2d 77, 80 (5th Cir.1979). The law is clear that in order to meet his burden defendant must come forward with "more than a scintilla" of evidence, *United States v. Reyes,* 645 F.2d at 287, that "'the government's conduct created a substantial

---

**3.** At all times relevant to the case before us Parr was separated from his wife.

**4.** In the en banc decision *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981),

this court adopted as precedent all decisions of the former Fifth Circuit decided prior to October 1, 1981.

risk that the offense would be committed by a person other than one ready to commit it.'" *United States v. Humphrey,* 670 F.2d at 155, *quoting Pierce v. United States,* 414 F.2d 163, 168 (5th Cir.), *cert. denied,* 396 U.S. 960, 90 S.Ct. 435, 24 L.Ed.2d 425 (1969). *See also United States v. Dean,* 666 F.2d 174, 180 (5th Cir.1982); *United States v. Tobias,* 662 F.2d 381, 384 (5th Cir.1981).

■ In determining the sufficiency of the evidence to raise the jury issue, the court should view the evidence in the light most favorable to the defendant. *United States v. Humphrey,* 670 F.2d at 156; *United States v. Reyes,* 645 F.2d at 287.

■ In the instant case appellant Rendaro did not take the stand or present any affirmative evidence in support of his claim of entrapment. He contends, however, that the government's case in chief sufficiently raised the entrapment issue to require the trial court to instruct the jury as to the entrapment defense. *See United States v. Reyes,* 645 F.2d at 286–87; *Sears v. United States,* 343 F.2d at 143. Judged by the foregoing standards, we disagree. The only evidence of government inducement to which appellant Rendaro can point is the fact that McMillan approached him first, not vice versa, and an assertion that Rendaro indicated doubts, disinterest and reluctance to engage in the operation. Appellant acknowledges, as indeed he must, that an initial approach by the government does not mean that automatically an entrapment instruction is required. *See United States v. Hill,* 626 F.2d 1301, 1304 n. 5 (5th Cir. 1980). Here any weight to be afforded the initial approach by McMillan is offset by the fact that McMillan's contact occurred in tracing back to Rendaro a circulated counterfeit bill and further by the fact that prior to this initial contact Rendaro had taken steps to encourage Donna Oles to handle the printing of the counterfeit money.

Appellant points to Oles' testimony that prior to the contact by McMillan Rendaro told her he had told Parr to "forget the whole thing" and to Rendaro's statement to McMillan on the 20th "Let's end it tonight for sure." These statements appear to have been made in frustration in response to Parr's somewhat erratic behavior and do not indicate any hesitancy on Rendaro's part to engage in the counterfeiting scheme for which he was convicted.

The record reveals that McMillan was a willing buyer, introduced to Rendaro by a government informant. Rendaro was a willing seller/middleman for the counterfeit operation, albeit a perhaps inexperienced and frustrated one due to Parr's behavior. The government simply provided an opportunity for Rendaro to exercise his preexisting interest in counterfeiting and provided a concrete reason for him to overcome his frustrations and the barrier to achievement of the scheme presented by Parr's conduct. *See United States v. Reyes,* 645 F.2d at 287.

■ Accordingly, there is no evidence in the record that would show that the government's conduct created a substantial risk that the offense would be committed by one other than one ready to commit it. *United States v. Humphrey,* 670 F.2d at 155; *United States v. Reyes,* 645 F.2d at 287. The district court correctly concluded that, as a matter of law, the evidence was insufficient to raise a jury question on the entrapment issue.[5]

II. *Extrinsic Acts under Fed.R.Evid. 404(b)*

At trial the government played for the jury the entire tape-recorded October 15 conversation between Rendaro, McMillan and the informant. Near the end of that conversation Rendaro described to McMillan how in the past he had developed lines of credit, obtained credit cards, made a series

---

**5.** We acknowledge that the district court, in reaching this conclusion, did not articulate the correct legal standard and appears to have interpreted this court's ruling in *United States v. Webster,* 649 F.2d 346 (5th Cir.1981) (en banc) incorrectly, to somehow increase the defendant's burden of production on the governmental inducement issue. Under the correct standards set forth above, however, the district court reached the correct result.

of small purchases with the credit cards and then never paid the credit card bills. Prior to the playing of this tape to the jury, counsel for Rendaro objected on the basis that the conversation about the credit cards constituted evidence of other crimes or acts, relevant only to appellant's character, and therefore should be excluded under Rule 404(b) of the Federal Rules of Evidence. The district court allowed the tape to be played in its entirety, stating that because the credit card activities did not constitute a criminal offense, Rule 404(b) did not apply.

Also, Agent McMillan, while testifying for the prosecution, made reference to a $100 counterfeit note that he had seen in connection with this case. Appellant's counsel objected on the ground that the $100 bill was outside the scope of the indictment and therefore also should be excluded as extrinsic offense evidence. The jury was given a curative instruction that any reference to the $100 note was to be disregarded.

Appellant argues that admission of evidence of these two extrinsic occurrences unduly prejudiced the jury against him. Because we find that admission of the statements about the credit card operation was not error and that appellant could not have been prejudiced by the brief reference to the $100 note, we reject appellant's contentions.

▪ Our analysis of the credit card evidence is guided by *United States v. Beechum,* 582 F.2d 898 (5th Cir.1978) (en banc). *Beechum* makes clear that evidence of extrinsic acts is admissible under Fed.R.Evid. 404(b) only if (1) it is relevant in some way other than to defendant's character *and* (2) the probative value of the evidence outweighs its prejudicial effect. *Id.* at 911.

*See also United States v. Mitchell,* 666 F.2d 1385, 1389 (11th Cir.1982).[6]

In addressing the relevancy prong of the test, the court in *Beechum* stated:

> Where the evidence sought to be introduced is an extrinsic offense, its relevance is a function of its similarity to the offense charged. In this regard, however, similarity means more than that the extrinsic and charged offense have a common characteristic. For the purposes of determining relevancy, "a fact is similar to another only when the common characteristic is the significant one for the purpose of the inquiry at hand." Stone, *The Rule of Exclusion of Similar Act Evidence: England,* 46 Harv.L.Rev. 954, 955 (1933). Therefore, similarity, and hence relevancy, is determined by the inquiry at issue to which the extrinsic offense is addressed.

*Beechum,* 582 F.2d at 911.

▪ Where, as the government here contends,[7] the evidence arguably is relevant to the appellant's intent, here the intent to defraud, "the relevancy of the extrinsic offense derives from the defendant's indulging himself in the same state of mind in the perpetration of both the extrinsic and charged offenses. The reasoning is that because the defendant had unlawful intent in the extrinsic offense, it is less likely that he had lawful intent in the present offense." *Id.* (footnote omitted). Necessary under both Counts I and III of Rendaro's indictment was the intent to defraud. The very same intent was evidenced by Rendaro's self-avowed[8] credit card activities: the intent to create an illusion of value thereby obtaining something for nothing. "Once it is determined that the extrinsic offense re-

---

**6.** Preliminarily we note that under Fed.R.Evid. 404(b) it is not only evidence of extrinsic *crimes* that is inadmissible if the relevant test is not met. The rule applies to evidence of "other crimes, wrongs, or acts." Thus, contrary to the district court's ruling, the evidence was not made admissible by virtue of the fact the credit card activity was not a criminal offense.

**7.** The government also contends the evidence was relevant to complete the story of what

transpired between McMillan and Rendaro. We do not reach this argument.

**8.** A first step in an extrinsic offense analysis is a determination that there is enough evidence for the jury to conclude the defendant in fact committed the extrinsic offense. *Beechum,* 582 F.2d at 913. Rendaro's self-declaration satisfies this test.

quires the same intent as the charged offense and that the jury could find that the defendant committed the extrinsic offense, the evidence satisfies the first step under rule 404(b)." *Id.* at 913. The relevancy prong of the *Beechum* test is satisfied here.

■ The second and final step of the analysis requires that we weigh the probative value of the evidence against its prejudicial effect. *Id.* The probative value of the evidence is to be measured in terms of its incremental significance to the government's case, the necessity for the evidence in light of the other evidence of intent to defraud. *Id.* at 914 & n. 18. "Thus, if the Government has a strong case on the intent issue, the extrinsic offense may add little and consequently will be excluded more readily." *Id.* at 914. Other factors to consider in evaluating probative value include the overall similarity of the extrinsic and the charged offenses and the closeness or remoteness in time of the charged to the extrinsic offense. *Id.* at 915.

■ Here the government presented a substantial but not overwhelming case on the intent issue. Additional evidence relevant to an intent to defraud cannot be said to have been unnecessary. As to similarity, both offenses, while far from identical, involve developing the appearance of value that can be used as purchasing power but which is in fact devoid of value. Thus, the offenses have more in common than the intent to defraud. *See id.* at 915. It ap-

pears also that the extrinsic acts were committed within a year or so of the charged offenses, a period not so remote as to diminish the probative value presented by the incremental value of the evidence and the overall similarity of the offenses.

We recognize the inherently prejudicial nature of such evidence, given the "deep tendency of human nature to punish, not because our victim is guilty this time but because he is a bad man and may as well be condemned now that he is caught. . . ." Wigmore, *Code of Evidence* (3d ed. 1942), p. 456. *See also Beechum,* 582 F.2d at 914. Moreover, unlike *Beechum,* 582 F.2d at 917, the district court here gave no cautionary instruction to mitigate the inherent prejudice from the credit card evidence. Given that the extrinsic act was of such a nature that the district court did not even perceive it to be a criminal act, however, and given further that the prosecution never emphasized the extrinsic act in its arguments to the jury or explicitly relied thereon as proof of intent, any resultant prejudice is minimal.

Accordingly we conclude that admission of the recorded conversation in its entirety, including the statements regarding the credit card scheme, meets the two-pronged test of *Beechum* and did not unduly prejudice the jury against appellant Rendaro.

■ Neither did the brief reference to a $100 counterfeit note by Agent McMillan [9]

9. The reference to the $100 bill was made in the following context when Agent McMillan was on the stand testifying for the government:

Prosecutor: Had you seen, at that point in time [October 20], any other counterfeit bills other than the one you originally mentioned receiving from Gary Cline?

McMillan: May I ask you a question? In reference to this case, or the Starlight Lounge?

Prosecutor: In reference to this case.

McMillan: Yes. I had.

Prosecutor: You had?

McMillan: Yes.

Prosecutor: What had you seen?

McMillan: Okay. I had seen a $100 counterfeit bill.

Prosecutor: But had you seen a $10 counterfeit?

McMillan: Yes, yes, in addition to the $10 bill that we had spoken about, there had been a $100 bill that I had seen.

Prosecutor: In addition to the $10 bill you had seen, were there any additional $10 Federal Reserve Notes?

McMillan: No, no.

This was the one and only reference to the $100 note except for the indirect reference in the cautionary instruction given by the court at the insistence of appellant's counsel. The court stated to counsel that a cautionary instruction could only highlight the reference, but counsel was insistent. R. at 360–63. The court instructed the jury: "If you heard in the testimony of this witness, Mr. McMillan, any reference to any other denomination of a bill, you should disregard it and give it no consideration, and I am striking from the evidence any reference of

in response to the prosecution's effort to elicit information about the $10 notes that were the subject of the indictment. The reference was in no way linked directly to Rendaro. Considering the context of the reference we hold that the evidence was not of an extrinsic act of *Rendaro* at all and therefore falls outside of the strictures of Rule 404(b). *See United States v. Gonzales,* 661 F.2d 488, 493–94 (5th Cir.1981) (evidence relevant to a transaction not charged in the indictment but occurring within the dates alleged in the indictment completed the account of the entire incident; not an "other" act); *United States v. Killian,* 639 F.2d 206, 211 (5th Cir.1981) (introduction of pistols and cocaine retrieved from defendant's house after arrest for charged offense of possession of cocaine inextricably intertwined with evidence of the charged transaction); *United States v. Aleman,* 592 F.2d 881, 885 (5th Cir.1979) (policy of Rule 404(b) "simply inapplicable when some offenses committed in single criminal episode become 'other acts' because the defendant is indicted for less than all of his actions").

▆ Appellant contends further that even if this is not extrinsic act evidence, failure of the government to notify defendant that the evidence would be used deprived him of a fair trial because he was unduly surprised and unable to adequately prepare his defense. The reference to the $100 note was an oblique one, in no way tied directly to appellant, and a cautionary instruction was given. Even assuming the failure of the government to prepare defendant for McMillan's reference to the $100 note was error, no prejudice could have resulted therefrom and there is no cause to reverse. *United States v. Gonzales,* 661 F.2d at 494–95.

We hold that admission of this evidence did not, either individually or conjunctively, unduly prejudice the jury and deprive appellant of a fair trial.

### III. Sufficiency of the Evidence as to Count V

Appellant next challenges the sufficiency of the government's proof as to his conviction under Count V of the indictment. Count V charged Rendaro with a violation of 18 U.S.C. § 474 based on the sample $10 counterfeit note he gave to Agent McMillan on October 21, 1981. Section 474, in seven different paragraphs, proscribes possession of equipment necessary to a counterfeiting operation or of counterfeit obligations themselves with intent to sell or otherwise use. The fifth paragraph, on which Rendaro's Count V indictment was based, states that persons in violation of § 474 shall include:

> Whoever has in his possession or custody, except under authority from the Secretary of the Treasury or other proper officer, any obligation or other security made or executed, in whole or in part, after the similitude of any obligation or other security issued under the authority of the United States, with intent to sell or otherwise use the same.

Rendaro contends that the evidence was insufficient to show that the counterfeit note he gave to McMillan was "made or executed, in whole or in part, after the similitude of any obligation or other security" of the United States and insufficient to prove the requisite intent.

▆ The standard by which this court is to judge the sufficiency of the evidence to sustain a conviction was stated in *United States v. Bell,* 678 F.2d 547 (5th Cir. Unit B) (en banc),[10] *affirmed on other grounds,* —— U.S. ——, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983):

> It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt. A jury is free to

---

that type. And you should not consider it in the case against either defendant." R. at 364.

**10.** In *Stein v. Reynolds Securities Corp., Inc.,* 667 F.2d 33, 34 (11th Cir.1982), this court adopted as precedent the decisions of Unit B of the former Fifth Circuit.

choose among reasonable constructions of the evidence.

*Id.* at 549 (footnote omitted). In assessing whether this standard is met we must consider the evidence in the light most favorable to the government. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Henderson,* 693 F.2d 1028, 1030 (11th Cir.1982); *United States v. Davis,* 666 F.2d 195, 201 (5th Cir. Unit B 1982).

▆ The basis of appellant's claim that the evidence was insufficient to establish that the counterfeit note in question was made in the "similitude" of an obligation of the United States is that, prior to trial, the note had been subjected to a fingerprint analysis procedure that gave the note a purplish hue, which it did not have at the time it was given to McMillan by Rendaro. This claim is devoid of merit.

The standard to adjudge the issue of "similitude" under § 474 is "whether the fraudulent obligation bears such a likeness or resemblance to any of the genuine obligations or securities issued under the authority of the United States as is calculated to deceive an honest, sensible and unsuspecting person of ordinary observation and care dealing with a person supposed to be upright and honest." *United States v. Turner,* 586 F.2d 395, 397 & n. 6 (5th Cir.), *cert. denied,* 440 U.S. 926, 99 S.Ct. 1258, 59 L.Ed.2d 480 (1978).

At trial, contemporaneously with the admission of the note in evidence, the government elicited testimony from a government fingerprint expert, and thereafter from Special Agent Keene to whom McMillan had given the note, that the purplish hue was absent when the bill initially was received. Appellant would have us rule that admission of this testimony and any re-

liance thereon by the jury somehow usurped the jury's role as the ultimate finder of fact on the "similitude" question.

The presentation of evidence to the jury is a far cry from usurpation of the jury's role. The note and the testimony were introduced to provide a basis for the jury to decide whether or not the note sufficiently resembled an obligation of the United States. Appellant had an opportunity to cross-examine the witnesses and indeed was successful in bringing out what he has characterized as certain inconsistencies in the fingerprint expert's testimony as to the original color of the note. Any such inconsistencies properly were before the jury to take into account in assessing whether the note was a "similitude" of an obligation of the United States. Such inconsistencies go to the weight, and not the admissibility, of the evidence. Based on this evidence, the jury concluded that the note qualified as a "similitude" of an obligation of the United States.

The note in question,[11] especially in view of the testimony explaining the absence of the purplish hue overlying it, is .far too similar to an authentic note for us to conclude that the jury could not have found that it satisfied the "similitude" standard of *United States v. Turner, supra.*[12] Accordingly we find that there was sufficient evidence on the similitude issue.

As to the sufficiency of the evidence of intent under § 474, appellant argues that even though § 474 explicitly requires only "intent to sell or otherwise use," the meaning of this section necessarily implies an intent to defraud or pass the bills as genuine as is expressly required under 18 U.S.C. §§ 472 and 473, respectively. He claims the government failed to prove that he had any intent to defraud in connection with

---

**11.** The note is, of course, a part of the record on appeal. The purplish color overlies the underlying green color of the note, but does not make impossible direct evaluation of the quality of the original green color.

**12.** The similitude standard enunciated in *Turner* which we, as did the *Turner* court, apply to a violation of 18 U.S.C. § 474, originated in inter-

preting 18 U.S.C. § 472. § 474 applies, as § 472 does not, to obligations "made or executed, in whole *or in part,* after the similitude . . . ." (emphasis added). Thus, the similitude standard has been applied more loosely when reviewing the sufficiency of the evidence under § 474. *United States v. Turner,* 586 F.2d at 398 n. 7.

the $10 note given to McMillan. He contends the note was passed as a mere sample and that all parties knew it was not to be used as genuine in the stream of commerce.

■ We disagree with appellant that the intent standard of § 474 necessarily implies an intent to defraud or an intent to pass as genuine. Congress explicitly stated that an "intent to sell or *otherwise use*" is the requirement. If Congress intended an intent to *defraud* or an intent to *pass as genuine* standard it would have said so explicitly, as in the two sections immediately preceding § 474. *See* 18 U.S.C. §§ 472, 473.

■ Here the evidence is undisputed that Rendaro intended to *use* the note to induce appellant to purchase large quantities of similar notes.[13] Such intent to use for unlawful purposes clearly falls within the scope of 18 U.S.C. § 474 and properly may be proscribed by Congress. Accordingly we affirm the conviction on Count V.

## IV. *Supplemental Instructions*

Finally appellant Rendero contends that written supplemental instructions given to the jury after their request for additional direction unfairly emphasized portions of the instructions favorable to the government and confused the jury so as to require a new trial. This claim also fails.

After having deliberated approximately one hour the jury submitted two questions to the court, seeking clarification of instructions. The jury asked in writing, on a paper referencing 18 U.S.C. § 471 at the top: (1) "Does the word 'made' mean that

Rendero [*sic*] has to be at the plant manufacturing the money?," (2) "And do they have to be guilty of both the first and second offenses to be found guilty?"

In response to these questions the court sent to the jury, over defense counsel's objection, the following responses:

Count III charges defendants Parr and Rendero [*sic*] under Sections 471 and 2 of Title 18 U.S.Code. See Pages 29, 30, 38, 39 and 40, the written instructions specifically and all of the other instructions.

If you can, you should return verdicts separately as to each Defendant and as to each Count in which a defendant is charged. A Defendant could be found guilty or not guilty as to either charge without regard to a finding on any other charge.

The guilty verdict was reached four minutes after the supplemental instructions were given.

■ As appellant realizes, the extent and character of additional instructions is within the sound discretion of the trial court. *United States v. Banks*, 485 F.2d 545 (5th Cir.1973), *cert. denied*, 416 U.S. 987, 94 S.Ct. 2391, 40 L.Ed.2d 764 (1974). *See also United States v. Andrew*, 666 F.2d 915, 922 (5th Cir.1982); *United States v. Miller*, 546 F.2d 320, 324 (9th Cir.1976). We conclude that the district court acted within its discretion in this case.

In regard to the first question and the answer thereto appellant contends that a balancing instruction, reemphasizing the burden of proof and the presumption of innocence, should have been given. He re-

---

**13.** This case is totally distinguishable from *United States v. Wilkerson*, 469 F.2d 963 (5th Cir.1972), *cert. denied*, 410 U.S. 986, 93 S.Ct. 1515, 36 L.Ed.2d 184 (1973), on which appellant primarily relies. *Wilkerson* arose under 18 U.S.C. § 472 which, as stated *supra*, requires an intent to defraud. *See also United States v. Wyatt*, 611 F.2d 568, 569–70 (5th Cir.1980) (intent to pass as genuine, under § 473, *may be* satisfied by showing general intent to defraud). This is not the criminal intent that need be proven here.

Appellant cites *United States v. Stiglets*, 463 F.2d 242 (5th Cir.1972), *cert. denied*, 409 U.S. 1039, 93 S.Ct. 521, 34 L.Ed.2d 488 (1973), a

§ 474 case, for the proposition that an intent to defraud or pass as genuine is required. In *Stiglets* the court held that where a violation of the fourth paragraph of § 474 is charged the government must prove an intent to use for forgery or counterfeiting printing plates that are possessed. This paragraph of § 474 *by its terms* requires, however, an intent to use for forging or counterfeiting. Thus, *Stiglets* is inapposite to the intent to use standard of the 5th paragraph of § 474 in issue here. Likewise, language in *United States v. Turner*, 586 F.2d at 399, saying defendant had "requisite criminal intent" does not mean that criminal intent must be the intent to defraud or pass as genuine.

lies on *United States v. Sutherland,* 428 F.2d 1152 (5th Cir.1970), *cert. denied,* 409 U.S. 1078, 93 S.Ct. 698, 34 L.Ed.2d 668 (1972), where this court stated:

In giving additional instructions to a jury—particularly in response to inquiries from the jury—the court should be especially careful not to give an unbalanced charge. If the Judge chooses to give any additional charge and elects not to repeat the entire original charge, he should remind the jury of the burden and quantum of proof and presumption of innocence or remind them that all instructions must be considered as a whole or take other appropriate steps to avoid any possibility of prejudice to the defendant.

*Id.* at 1157–58. *See also United States v. Carter,* 491 F.2d 625, 633 (5th Cir.1974), *quoting Bollenbach v. United States,* 326 U.S. 607, 613, 66 S.Ct. 402, 405, 90 L.Ed. 350 (1946) (where a jury seeks clarification after a period of deliberation court should be aware of probability jurors will place particular emphasis on the supplemental instructions and pay special care to avoid inaccuracy or imbalance—where jury expresses confusion and difficulty, trial court has an obligation to "clear them away with concrete accuracy").

■ Here the answer to the jurors' first question referred them to specific portions of the instructions already given and did sufficiently "remind them that all instructions must be considered as a whole," *Sutherland,* 428 F.2d at 1158, by referring them to all of the instructions. Indeed, in a very similar situation, the Fifth Circuit has taken "the position that a judge may have the jury re-read portions of the original instructions provided the reinstruction does not mislead or confuse the jury." *United States v. Andrew,* 666 F.2d at 922. *See also United States v. Cotton,* 646 F.2d 430, 434 (10th Cir.1981); *United States v. Lang,* 644 F.2d 1232, 1239 (7th Cir.1981); *United States v. Castenada,* 555 F.2d 605, 611 (7th Cir.), *cert. denied,* 434 U.S. 847, 98 S.Ct. 152, 54 L.Ed.2d 113 (1977). In fact reference back to the originally delivered instructions could be construed as not a supplemental instruction at all. *Cf. United States v. Rob-*ertson, 659 F.2d 652, 659 (5th Cir.1981) (clarification of instructions by giving examples does not constitute "a new charge requiring balancing instructions").

■ Appellant argues that the instruction was misleading and confusing because the jury's question, while referencing 18 U.S.C. § 471 at the top of the page, did not indicate to what count it was referring. It is true that both Counts I and III of the indictment charge a violation of § 471. If the jury were asking about Count I, the conspiracy count, appellant contends the court's reference to the instructions on the aiding and abetting statute would only have confused the jury. Here, as in *United States v. Andrew,* 666 F.2d at 922, "[t]hat there was no further inquiry after the judge's response to the note [ ] indicates that the judge's response cleared the jury's difficulty with concrete accuracy." Furthermore, the fact that the jury reached a decision so quickly after the response was received indicates that the jury was not confused and that the judge's reply was responsive to its concerns.

The judge's response to the second question did not refer back to the original instructions but gave supplemental directions to consider each count and each defendant separately. Appellant correctly notes that the jury's question is far from clear and the reference to the "first and second offenses" could have referred to Counts I and II, the two objects or the two overt acts charged in the conspiracy count (Count I), or to two elements of the offense alleged in Count III. Appellant alleges that the court's response was vague, unresponsive and confusing, and failed "to clear away [the jury's confusion and difficulty] with concrete accuracy." *United States v. Carter,* 491 F.2d at 633, *quoting Bollenbach v. United States,* 326 U.S. at 613, 66 S.Ct. at 405. We agree that the question was unclear but disagree that the court's response evidences an abuse of discretion.

■ Regardless of speculation as to the various possible meanings of the jury's question, the district court evidenced no

ambivalence in interpretation. He replied with a completely balanced charge, informing the jury that each count was to be considered separately, each defendant separately, and that "[a] defendant could be found guilty or not guilty as to either charge without regard to a finding on any other charge." Given the balanced nature of the instruction, the absence of any further inquiry by the jury, and, indeed, the brevity of the period between submission of the response and the resolution of the verdict,[14] the supplemental instruction must have eliminated the jury's confusion with "concrete accuracy." *Bollenbach v. United States,* 326 U.S. at 613, 66 S.Ct. at 405.

■ We hold that the district court's supplemental instructions adequately, and in a balanced fashion, resolved the jury's confusion and represented no abuse of discretion.[15]

Having rejected all four claims raised by appellant Rendaro, we AFFIRM his convictions.

*Appellant Parr*

Appellant Parr raises three claims: (1) whether the district court should have granted his motion to suppress the sixteen counterfeit bills seized by the fire fighters and the police at his home on the night of the fire, (2) whether the district court erred in failing to suppress an incriminating statement made by him at the Secret Service station the night of his arrest, and (3) whether there was sufficient evidence to sustain the conviction for possession with intent to defraud under 18 U.S.C. § 472 (Count II).

Because the motion to suppress should have been granted as to the sixteen counterfeit bills which formed the basis for Count II of the indictment, we REVERSE appellant's conviction on that count, and do not reach appellant's third claim which relates solely to that conviction. Because we reject appellant's second argument, we AFFIRM the convictions on the conspiracy count (Count I) and Count III.

### I. Seizure by Fire Fighters and Police Pursuant to Alleged Policy of Securing Valuables

■ Appellant Parr challenges the seizure of the sixteen counterfeit bills from his home on the night of the fire as violative of the Fourth Amendment. He does not challenge the authority of fire officials to enter his home to extinguish the fire nor to remain for a reasonable time to investigate the cause of the fire after it was extinguished. *See Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). Nor does appellant refute the fact that fire officials may seize evidence of *arson* that is in plain view when they are performing one of these two concededly legitimate purposes. *Id.* 98 S.Ct. at 1950. What appellant does assert is that the Fourth Amendment does not condone investing in fire officials the unbridled discretion randomly to choose which parts of a burned dwelling should be searched pursuant to a general practice of salvaging valuables, ostensibly for the protection of the owner of the burned house. Resolution of this claim requires careful balancing of interests and sensitive reconciliation of conflicting legal principles. We hold that, at least where the policy is not executed pursuant to standardized procedures that narrowly channel the discretion of fire officials to determine the scope and

---

**14.** Appellant argues that the short period, only a matter of minutes, between receipt of the response and the reaching of a verdict by the jury, strongly *suggests the supplemental* charge was decisive. This is true. Appellant argues, however, that it was decisive because it was balanced in favor of the government and prejudiced against the defense. However, neither of the supplemental answers was imbalanced and the quickness with which a result

was reached undercuts appellant's argument that the jury remained confused.

**15.** While supplemental instructions delivered verbally are preferred to purely written ones, *United States v. Solomon,* 565 F.2d 364, 366 (5th Cir.1978), use of written supplemental instructions does not automatically create an abuse of discretion and nothing in this specific case indicates that use of written instructions here was an abuse.

subject of the search of a burned dwelling,[16] a policy of seeking out and salvaging valuables without an administrative warrant violates the dictates of the Fourth Amendment.

Preliminarily, and contrary to the government's argument, the salvage procedure here in issue clearly qualifies as a search within the Fourth Amendment. "[T]he 'basic purpose of [the Fourth] Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by government officials.' The officials may be health, fire, or building inspectors. Their purpose may be to locate and abate suspected public nuisance, or simply to perform a routine periodic inspection. . . . These deviations from the typical police search are thus clearly within the protection of the Fourth Amendment." *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), *quoting Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967).

In *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978), the Supreme Court evaluated the applicability of the Fourth Amendment warrant requirement to the duties of fire officials. There the Court carefully reasoned:

> [T]here is no diminution in a person's reasonable expectation of privacy nor in the protection of the Fourth Amendment simply because the official conducting the search wears the uniform of a firefighter rather than a policeman, or because his purpose is to ascertain the cause of a fire rather than to look for evidence of a crime, or because the fire might have been started deliberately. Searches for administrative purposes, like searches for evidence of crime, are encompassed by the Fourth Amendment. . . . The showing of probable cause necessary to secure a warrant may vary with the object and

intrusiveness of the search, but the necessity for the warrant persists.

*Id.* 98 S.Ct. at 1948 (footnote omitted). The Court specifically held:

> In short, the warrant requirement provides significant protection for fire victims in this context, just as it does for property owners faced with routine building inspections. As a general matter, then, official entries to investigate the cause of a fire must adhere to the warrant procedures of the Fourth Amendment. . . . [A warrantless entry by fire fighters] is illegal unless it falls within one of the "certain carefully defined classes of cases" for which warrants are not mandatory.

*Id.* 98 S.Ct. at 1949, *quoting Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967).

The Court proceeded to discuss the only arguably applicable exception to the warrant requirement: exigent circumstances where there is a compelling need for official action and no time to secure a warrant. *Id.* 98 S.Ct. at 1949–50, *citing Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); *Ker v. California,* 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963) and *Camara v. Municipal Court,* 387 U.S. at 539, 87 S.Ct. at 1736 and cases cited therein. The Court reasoned that "[a] burning building clearly presents an exigency of sufficient proportions to render a warrantless entry 'reasonable.' Indeed, it would defy reason to suppose that firemen must secure a warrant or consent before entering a burning structure to put out the blaze." *Id.* 98 S.Ct. at 1950.

The Court also stated that "[f]ire officials are charged not only with extinguishing fires but with finding their causes." *Id.*

Because determining the cause of a fire is one of the core functions of fire fighters, the Court concluded that "[o]nce in a building for this purpose, fire fighters may seize

---

**16.** This is not to say that creation of such standardized procedures automatically will obviate the warrant requirement. *Cf. Camara v. Municipal Court,* 387 U.S. 523, 534, 536, 87 S.Ct. 1727, 1733, 1734, 18 L.Ed.2d 930 (1967) (warrant requirement applies to administrative searches authorized by city code even though code required searches be at "reasonable times"). This question is left for another day.

evidence *of arson* that is in plain view." *Id., citing Coolidge v. New Hampshire,* 403 U.S. 443, 465–66, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 564 (emphasis supplied). Furthermore, and also because ascertaining the cause of the fire is a duty with which fire officials consistently are charged, "officials need no warrant to remain in a building for a reasonable time *to investigate the cause of a blaze* after it has been extinguished." *Id.* (emphasis supplied) (footnote omitted).

The government here argues that the search for valuables after the fire has been extinguished also should fall within the same exigent circumstances that justified initial entry into Parr's home. "[T]he burden of proof [belongs] to the state to establish that an exception to the search warrant requirement was applicable in the subject case. . . ." *United States v. Bachner,* 706 F.2d 1121 at 1126 (11th Cir.1983).

■ The logic of the Court's opinion in *Michigan v. Tyler* leads us to conclude that where fire fighters are pursuing a purpose less clearly defined as one of the core duties with which they are charged, searches of a burned dwelling for that purpose, after the fire has been extinguished, do not fall within the exigent circumstances created by the fire and thus are unlawful in the absence of a warrant. This case, in which the fire had been extinguished and the search for and seizure of valuables was to protect those items from looters, is distinguishable from removal of valuables from a home to protect them from destruction by a raging fire. There the exigency created by the fire would make warrantless removal of goods totally reasonable. Here no such exigency existed.

Arguments can be made, of course, that the need to secure valuables against looters is an exigency which, along with extinguishing the blaze and ascertaining the cause of the fire, should be excepted from the warrant requirement.

First, a considerable segment of the population probably would consent to searches to secure valuables.[17] As the Court in *Camara v. Municipal Court,* 387 U.S. at 536, 87 S.Ct. at 1735, stated, however, this argument "even if true, is irrelevant to the question whether the [salvage] inspection is reasonable within the meaning of the Fourth Amendment."

■ Second, the protection of valuable property of the fire victim from vandals and looters certainly is a legitimate governmental interest. *See South Dakota v. Opperman,* 428 U.S. 364, 369, 96 S.Ct. 3092, 3097, 49 L.Ed.2d 1000 (1976); *id.* 96 S.Ct. at 3102 (Powell, J., concurring); *id.* at 3108 (Marshall, Brennan & Stewart, JJ., dissenting).

The legitimacy of this interest, however, does not undercut the necessity for a warrant to safeguard the substantial privacy interests implicated by any entry into a person's home by a governmental official. *Payton v. New York,* 445 U.S. 573, 585–90, 100 S.Ct. 1371, 1379–82, 63 L.Ed.2d 639 (1980); *Mincey v. Arizona,* 437 U.S. 385, 393–94, 98 S.Ct. 2408, 2414, 57 L.Ed.2d 290 (1978); *Michigan v. Tyler,* 436 U.S. at 507–10, 98 S.Ct. at 1948–50.[18]

In *Michigan v. Tyler,* the Court imposed the warrant requirement on all searches undertaken to investigate the cause of the fire, excepting only those where the officials "remain in a building for a reasonable time to investigate the cause of a blaze after it is extinguished." *Id.* 98 S.Ct. at 1950 (footnote omitted). These limited searches were included within the scope of the exigency justifying the original warrantless entry to extinguish the fire due to two interests: preventing fires and discovering evidence of criminal activity related to the cause of the fire. *Id.* at 1950. Both are in large part public interests, not the purely private interests of the owner or

---

17. The dissent obviously agrees, but does not proceed to Fourth Amendment analysis.

18. "[T]he mere fact that law enforcement may be made more efficient can never by itself justify disregard of the Fourth Amendment. The investigation of crime would always be simplified if warrants were unnecessary." *Mincey v. Arizona,* 437 U.S. at 393, 98 S.Ct. at 2414 (citation omitted).

occupant of the home. Searches to secure valuables from looters and vandals, while peripherally serving a public interest in prevention of crime, are undertaken almost exclusively to protect the interests of the fire victim. The Fourth Amendment, however, seeks to protect a different interest of that same fire victim. "[E]ven the most law-abiding citizen has a very tangible interest in limiting the circumstances under which the sanctity of his home may be broken by official authority, for the possibility of criminal entry under the guise of official sanction is a serious threat to personal and family security." *Camara v. Municipal Court,* 387 U.S. at 530–31, 87 S.Ct. at 1732. "At the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961).

Hence, in deciding whether to extend the exigent circumstances exception of the warrant requirement to the facts of this case, we are forced to choose between affording greater protection to the fire victim's privacy rights, by holding that searches to secure valuables in the home after the fire has been extinguished are outside the scope of the exigent circumstances exception to the warrant requirement, or to the property rights of that same victim, by according fire fighters license to search for valuable property after a fire without a search warrant. Given the high value placed on the interests underlying the protections of the Fourth Amendment as applied to the sanctity of the home, we choose the former.[19]

In *Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978), the Supreme Court made clear that where an entry into a home is justified by emergency

circumstances a warrant must be obtained for any search exceeding the scope of the exigency, and "[a] warrantless search must be 'strictly circumscribed by the exigencies which justify its initiation ....'" *Id.* 98 S.Ct. at 2413, *quoting Terry v. Ohio,* 392 U.S. 1, 25–26, 88 S.Ct. 1868, 1882–83, 20 L.Ed.2d 889 (1968). Similarly, in *United States v. Brand,* 556 F.2d 1312, 1317 n. 9 (5th Cir.1977), this court specifically stated that an officer entering a home pursuant to the exigent circumstances exception may not search the premises beyond the scope justified by the exigency without obtaining a warrant. We reaffirm that ruling here, holding that the search for valuables falls outside the immediate exigency created by the fire and must be supported by a warrant. *See also United States v. Lyons,* 706 F.2d 321 (D.C.Cir.1983).

The search of Parr's home for valuables also falls outside the scope of the "inventory search" exception to the warrant requirement. *Illinois v. Lafayette,* —— U.S. ——, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983); *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976). *See also United States v. Chadwick,* 433 U.S. 1, 10 n. 5, 97 S.Ct. 2476, 2483 n. 5, 53 L.Ed.2d 538 (1977).

First, the procedure at issue here is not an "inventory" at all, but selective confiscation of arbitrarily selected goods.

More important, even if an inventory in this context were plausible, the "inventory search" exception has never been applied to searches of someone's *home.* Cf. *United States v. Laing,* 708 F.2d 1568 (11th Cir. 1983); *United States v. Bosby,* 675 F.2d 1174 (11th Cir.1982); *United States v. Prescott,* 599 F.2d 103 (5th Cir.1979); *United States v. Edwards,* 577 F.2d 883 (5th Cir.) (en banc), *cert. denied,* 439 U.S. 968, 99 S.Ct. 458, 58 L.Ed.2d 427 (1978). On the

19. We note that in *Michigan v. Tyler* searches conducted a few hours after the fire were considered to be within "a reasonable time," 98 S.Ct. at 1950, and thus included within the scope of the exigency justifying entry to put out the blaze and search for evidence of its cause. The search for valuables here was conducted contemporaneously with the search for cause of the fire. We do not base our decision on any temporal distinction between this and *Michigan v. Tyler.* Rather it is the *purpose* of the search that leads us to conclude that the search for valuables is not within the scope of the exigency created by the need to extinguish and discover the cause of the fire.

contrary the Supreme Court consistently has afforded greater protection from searches of homes and other private buildings than from searches of automobiles, or arrested persons and their personal effects, by applying the warrant requirement in full force to the former, be it for searches in the criminal or non-criminal context. *Compare Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980) ("In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant"); *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978); *G.M. Leasing Corp. v. United States,* 429 U.S. 338, 354, 97 S.Ct. 619, 629, 50 L.Ed.2d 530 (1977) (distinguishing warrantless searches of some regulated businesses from those in private dwellings or property); *United States v. District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972) ("physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed"); *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967) *with Illinois v. Lafayette, supra,* —— U.S. ——, 103 S.Ct. 2605, 77 L.Ed.2d 65; *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *United States v. Martinez-Fuerte,* 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976) (upholding warrantless, routine checkpoint stops of automobiles "where we deal neither with searches nor with the *sanctity of private dwellings, ordinarily afforded the most stringent Fourth Amendment protection*") (emphasis supplied). As noted above, the Court in *Payton v. New York,* 445 U.S. at 590, 100 S.Ct. at 1382, made clear that only exigent circumstances will justify a warrantless intrusion into a home. An "inventory search exception" will not be used by this court as a bootstrap to undermine the Fourth Amendment protections afforded the sanctity of the home.

A review of the principles expressed in *South Dakota v. Opperman,* 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976), supports our conclusion. There the Supreme Court explored the legality of warrantless, routine, inventory searches of impounded automobiles, undertaken in part to protect the property of the car owner or most recent occupant. *See also Illinois v. Lafayette,* —— U.S. ——, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) (extending "inventory search exception" to warrant requirement to searches of arrestee and his personal effects in a police station).

In concluding that such searches did satisfy the requirement of the Fourth Amendment the Court relied primarily on two factors. These factors are so noticeably absent in the case of searches of burned dwellings to secure valuables that we are convinced the logic of *Opperman* compels that here a contrary result be reached. *See United States v. Lyons,* 706 F.2d 321 (D.C.Cir.1983) (distinguishing *Opperman;* warrant must be obtained for search for evidence in hotel room, scene of arrest, even though initial entry was justified by consent to undercover police to engage in drug transaction).

The first factor relied upon by the *Opperman* Court was the "traditionally drawn [ ] distinction between automobiles and homes or offices in relation to the Fourth Amendment." *Opperman,* 96 S.Ct. at 3096. The Court noted that "warrantless examinations of automobiles have been upheld in circumstances in which a search of a home or office would not," *id.,* and emphasized the reasons for the distinction: the inherent mobility of automobiles and the diminished expectation of privacy in automobiles as compared to homes or other buildings. *Id.* at 3096–97. Even though an inventory search of an arrestee's personal effects in a police station has been found to implicate a privacy interest insufficiently greater than that which exists in an automobile to distinguish it from an *Opperman* inventory search, given the greatly enhanced privacy interest in a home, this distinction supports a finding that satisfaction of the standards of *Opperman* would not suffice to justify a warrantless search of a home, as is in issue

in this case. *See* text *supra* at 813–814; *United States v. Lyons, supra* 706 F.2d at 325. *Cf. Illinois v. Lafayette, supra* (inventory search exception applicable to search of arrestee and his personal effects in a police station); *Harris v. United States,* 390 U.S. 234, 88 S.Ct. 992, 9 L.Ed.2d 1067 (1968).

The second factor relied upon by the *Opperman* Court was the existence of routine, uniform, standard procedures by which the inventory searches are undertaken by police. *Opperman,* 96 S.Ct. at 3097, 3098–99; *id.* at 3104 (Powell, J., concurring).[20] *See also Illinois v. Lafayette,* —— U.S. ——, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983) (emphasizing "inventory search exception" applicable where "standardized" and "routine" procedure used in police station).

In the instant case, not only was the non-criminal inventory-type search for salvageable valuables undertaken within an individual's *home* rather than a car, but no standardized procedures were used. While the existence of the general policy of the Tampa Fire Department of searching for valuables is not contested, Record at 71, 83–84, absolute discretion is invested in the individual fire fighter as to the scope and focus of the search. Record at 71, 80–81.

Fire Inspector Burke, Stone's superior at the scene of the Parr fire and the individual to whom Stone turned over the money, testified that while, for his own personal

---

**20.** Indeed Justice Powell's instructive concurrence shows that the presence of the standardized procedures by which the automobile inventories are undertaken was the single factor precluding the applicability of all of the interests underlying the warrant requirement and thus the one factor making an exception to the warrant requirement in *Opperman* reasonable. 96 S.Ct. at 3104. (Powell, J., concurring).

Justice Powell identified three purposes underlying the warrant requirement. First, "In the criminal context the requirement of a warrant protects the individual's legitimate expectation of privacy against the over-zealous police officer." *Id.* Justice Powell concluded that this interest was not at issue in *Opperman* because "Inventory searches [ ] are not conducted in order to discover evidence of crime. *The officer does not make a discretionary determination to search* based on a judgment that certain conditions are present. *Inventory searches are conducted in accordance with established police department rules or policy* and occur whenever an automobile is seized." *Id.* (emphasis added).

The second but related purpose of the warrant requirement identified by Justice Powell "is to prevent hindsight from affecting the evaluation of the reasonableness of the search." *Id.* Again the reason this interest was not implicated in *Opperman* was that "[i]n the case of an inventory search *conducted in accordance with standard police department procedures,* there is no significant danger of hindsight justification." *Id.* (emphasis added).

The third purpose identified relied on the language of *Camara v. Municipal Court, supra,* and explained the reason why warrants are required outside the criminal context.

"The practical effect of [the existing warrantless search procedures had been] to leave the occupant subject to the discretion of the official in the field," since "when [an] inspector demands entry, the occupant ha[d] no way of knowing whether enforcement of the municipal code involved require[d] inspection of his premises, no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector [was] acting under proper authorization."
*Id.* at 3104, *quoting Camara v. Municipal Court,* 387 U.S. at 532, 87 S.Ct. at 1732.

Justice Powell's conclusion that the same concerns were not presented in *Opperman* is particularly instructive here:

In the inventory search context these concerns are absent. The owner or prior occupant of the automobile is not present, nor, in many cases, is there any real likelihood that he could be located within a reasonable period of time. *More importantly, no significant discretion is placed in the hands of the individual officer: he usually has no choice as to the subject of the search or its scope.*[11]
*Id.* at 3104–05 (emphasis supplied). Footnote 11 noted the use of the police in that case of standard inventory sheets and guidelines for what items were to be removed from the car. *See also Michigan v. Tyler,* 436 U.S. at 507, 98 S.Ct. at 1949 (Court noted that administrative searches often are deemed reasonable only because "a reasonable balance between these competing concerns [need for intrusion and threat of disruption to occupant or owner] is usually achieved by broad legislative or administrative guidelines specifying the purpose, frequency, scope, and manner of conducting the inspections").

Thus a close reading of *Opperman* convinces us that but for the standardized procedure used for routine inventory searches of impounded automobiles, the warrantless searches of the impounded cars probably would not have been approved.

information, he inventories the valuable property gathered, there is no standardized inventory procedure followed. Record at 84. He stated that he thought the police department categorized the items if and when the valuables were turned over to them. Record at 84. No direct evidence was presented on this point.

More importantly, even assuming that under this salvage policy the confiscated valuables are turned over to the police department for safekeeping if the owner does not return prior to the fire department vacating the premises, and assuming that the police department does properly inventory the items held, it is undisputed that here the decision as to the scope of the search and the procedures to be followed in the search were committed totally to the unguided discretion of the individual fire fighter. The individual fire fighter decided whether or not to look through closets, drawers, desks, personal papers, toiletries, bathrooms, or bedrooms, or any other portion of the house, no matter how remote from the source of the fire, without any set standards to guide his decision. "The practical effect of this system [was] to leave the occupant [or owner] subject to the discretion of the official in the field. This is precisely the discretion to invade private property which we have consistently circumscribed by a requirement that a disin-

terested party warrant the need to search." *Camara v. Municipal Court*, 387 U.S. at 532–33, 87 S.Ct. at 1733.

■ We therefore hold that searches for and seizures of valuables in a burned dwelling neither fall within the inventory search exception nor the same exigent circumstances exception to the warrant requirement that justifies entry to extinguish and ascertain the cause of a fire. Prior to undertaking such searches, absent consent or the presence of other exceptions to the warrant requirement, warrants should be obtained pursuant to the procedures governing administrative searches.[21] *See Michigan v. Tyler*, 436 U.S. at 511, 98 S.Ct. at 1951; *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 320–21, 98 S.Ct. 1816, 1824–25, 56 L.Ed.2d 305 (1978); *Camara v. Municipal Court*, 387 U.S. at 534–39, 87 S.Ct. at 1733–36. *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967).

■ We also note that the facts in the instant case do not support application of the plain view doctrine. A review of the record reveals that the evidence here in question was not in "plain view" to the fire fighter in the scope of his investigation of the cause of the fire or in his efforts to extinguish the fire, but was in a place intruded upon only pursuant to his search for valuables.[22] The evidence was not in plain

---

21. In evaluating whether a warrant should issue, a magistrate properly would consider the need to secure valuables in the instant case, e.g., did the particular fire and the extinction thereof leave the house unsecurable (were doors and walls knocked down); are there reasonable alternatives to searching; is there a basis for assuming the owner or occupant will not soon return; have reasonable efforts been made to locate the owner or occupant and obtain consent. *See Michigan v. Tyler*, 98 S.Ct. at 1949. This list is, of course, not exhaustive.

The Supreme Court has held that the existence of less restrictive alternatives to a search are not to be considered in calculating whether a search which falls into an exception to the warrant requirement is reasonable. *Illinois v. Lafayette, supra*, —— U.S. at ——, 103 S.Ct. at 2610. Our discussion of available alternatives is premised on our conclusion that exceptions to the warrant requirement are inapplicable and is directed toward factors proper for a

magistrate's consideration when considering an application for a warrant.

This opinion should not be read to say that premises should be left unprotected during the time fire officials are seeking a warrant. In the interim period all reasonable efforts short of searching and seizing the property should be undertaken, e.g., guarding the premises.

22. Fire fighter Stone, who discovered the bills in the sugar bowl, testified that he could not see the bills prior to taking the bowl off the shelf and looking into it. Record at 75.

We therefore express no opinion, because the issue is not before us, as to whether when fire fighters are investigating the cause of the fire and seeking evidence of that cause, they see evidence of unrelated criminal activity, and surrender the evidence to police officers, the "plain view" doctrine justifies the seizure of the evidence. *Cf. Texas v. Brown*, —— U.S. ——, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983);

view "during the course of [his] legitimate emergency activities." *Mincey v. Arizona,* 437 U.S. 385, 393, 98 S.Ct. 2408, 2413, 57 L.Ed.2d 290 (1978).

■ In short, based on the principles underlying the Supreme Court's decisions in *Michigan v. Tyler, supra, Payton v. New York, supra,* and *South Dakota v. Opperman, supra,* and our judgment in *United States v. Brand, supra,* we conclude that the warrantless search of Parr's house ostensibly to secure valuables, undertaken pursuant to no routine, standardized procedures, without exigent circumstances, and yielding evidence not in plain view to the fire fighters, did not satisfy the requirements of the Fourth Amendment.

The principles set forth above dictate that the conviction of Appellant Parr under Count II of the indictment be reversed, as the sixteen bills seized after the fire constitute the sole basis for that indictment. Because, however, the unlawful seizure of the sixteen counterfeit notes did not taint the convictions on Count I and III and the sixteen bills were not introduced as evidence to support those convictions, this holding leaves those convictions unaffected.

## II. *Motion to Suppress Written Statement*

Appellant next argues that his motion to suppress a written, incriminating statement made to the Secret Service on the night of his arrest should have been granted because the statement was not knowingly and voluntarily made.

Parr contends that at the time of his arrest on October 21, 1981, he was unable to think clearly, to reason or to understand the nature of the federal agent's interrogation, due to excessive amounts of medication and an accident occurring on October 16, 1981, resulting in temporarily diminished mental capacity. He argues the signing of the written *Miranda* warning and waiver of his

rights and his statement are not valid because they were not the product of a rational intellect.

Agent Tuller of the Secret Service testified that he arrested Appellant Parr on October 21 outside the Hour Quick Print Shop, and at that time read appellant his *Miranda* rights. Agent Tuller also testified that at that time Parr indicated that he understood those rights. Parr then was transported to the Secret Service station, where he again was advised by Tuller of his rights. Appellant next executed a Warning and Waiver of Rights to which the defense stipulated at trial. He then made an incriminating statement that was reduced to writing and signed by him. During the motion to suppress hearing, Parr took the stand, acknowledged his signature on the waiver form and the written statement, remembered signing the forms but did not remember Agent Tuller going over the form and the statement with him as Agent Tuller had testified that he did. Parr also testified that he did not recall having his rights read to him.

■ In *Miranda v. Arizona,* 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706–07 (1966), the Supreme Court held that evidence obtained as a result of a custodial interrogation is inadmissible unless the defendant had first been warned of his rights and knowingly waived those rights. *See Sullivan v. Alabama,* 666 F.2d 478, 482 (11th Cir.1982). Where, as here, interrogation continues in the absence of counsel for the defendant, the government must show that the defendant made a knowing, voluntary, and intelligent waiver of his rights. *Miranda v. Arizona,* 384 U.S. at 475, 86 S.Ct. at 1628, 16 L.Ed.2d at 724; *Sullivan v. Alabama,* 666 F.2d at 483.

■ Whether a valid waiver of constitutional rights is made is a question of law on which an appellate court must make an

---

Harris v. United States, 390 U.S. 234, 88 S.Ct. 992, 19 L.Ed.2d 1067 (1968). See also Michigan v. Tyler, 436 U.S. at 509, 98 S.Ct. at 1950 (once in a building for this purpose, fire fighters may seize evidence of arson in "plain view"); United States v. Hoffman, 607 F.2d 280

(9th Cir.1979) (entry by police officer into burned dwelling for purpose of seizing evidence of crime unrelated to fire but seen in plain view by fire fighters when putting out the fire, violated the Fourth Amendment); United States v. Brand, 556 F.2d 1312, 1317–18 (5th Cir.1977).

independent judgment, *Beckwith v. United States,* 425 U.S. 341, 348, 96 S.Ct. 1612, 1617, 48 L.Ed.2d 1 (1976); *Davis v. North Carolina,* 384 U.S. 737, 741–42, 86 S.Ct. 1761, 1764, 16 L.Ed.2d 895, 898 (1966), based on the totality of the circumstances. *Blackburn v. State,* 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960). *See also North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); *Sullivan v. Alabama,* 666 F.2d at 482–83.

■ Viewing the totality of the circumstances here the district court did not err in refusing to suppress the written statement. Agent Tuller testified that *Miranda* warnings were at least twice given to the appellant. Appellant testified only that he did not remember. The government elicited testimony from Agent Tuller that at the time of the warnings and appellant's written statement, appellant "appeared to be fully coherent of what was going on" and "appeared to have his mental faculties about him." His speech was normal, he complained of no illnesses and he walked without difficulty. Donna Oles testified that on October 16 Parr told her he had been hit by a car. She took him to a doctor that day and a hospital the next. On the 19th, after the fire at Parr's house, he complained of dizziness and she took him to another hospital. Oles testified that on several occasions during this period, she observed Parr punch himself behind his left ear and heard him state that if it was not red he would make it red and that he felt sick even if they did not think he was sick. Parr and Oles testified that commencing on October 12 Parr had been taking prescription medicine, prescribed to relax his nerves and help him sleep. The pharmacist testified to filling the prescription for Dalmane and Centrax on October 12. On October 16 the prescription was refilled. Parr, although stating he remembered little of what had transpired during the period between October 12 and October 21, 1981, testified that he thought he recalled taking most of this medication on the 16th, possibly some on the 17th, but if any was left he *may* have taken it on the 21st, the day of his arrest. Oles testified, however, that

Parr had worked three or four hours in the print shop on the 21st and seemed "very alert" and "his manner of speaking was very well on the 21st."

While the conduct of the accused is only one factor in evaluating the validity of a waiver, *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938); *Sullivan v. Alabama,* 666 F.2d at 483, here there is not only the testimony of a government agent that appellant was read his rights, waived his rights, and made the statement in question, but there exist signed copies of both the waiver and the statement. Furthermore, appellant's own testimony establishes that to the best of his memory he had taken all of the medication allegedly contributing to his temporarily diminished mental capacity on the 16th of October, and perhaps some on the 17th, a full four to five days before his arrest and the making of the statement. All of these factors were taken into account by the district court in denying the motion to suppress the written statement. In addition the district court was able, as we are not, to evaluate the credibility of the witnesses at the motion to suppress hearing.

Accordingly, after reviewing the record, we agree with the district court that Parr made a knowing, voluntary, intelligent waiver of his constitutional rights.

*Conclusion*

On all counts, the convictions of Appellant Rendaro are AFFIRMED. The conviction of Appellant Parr on Count II of the indictment is REVERSED; his convictions on Counts I and III are AFFIRMED.

RONEY, Circuit Judge, concurring in part and dissenting in part.

I concur in the affirmance of Rendaro's convictions and Parr's convictions as to Counts I and III. I dissent from the reversal of Parr's Count II conviction.

The Court finds a fourth amendment violation in the seizure by a fire fighter of currency discovered during a time when exigent circumstances legitimatized his entry of the building, his activity in extinguishing the fire, and his investigation as to

its cause. *Michigan v. Tyler,* 436 U.S. 499, 98 S.Ct. 1942, 56 L.Ed.2d 486 (1978). The Court refuses to extend the exigency exception to a seizure of currency for the purpose of protecting it for the owner. So far am I from the convoluted reasoning that brings the Court to this result, that I would think it unreasonable for the fire fighter not to make the rather cursory search that was made here and not to take possession of that which could be easily protected for the owner.

Once the seizure was made, the inventory of what was seized was clearly appropriate. It was during this inventory that the currency was revealed to be counterfeit. At that point, the fire fighter could not return it to the owner, but was obligated to turn the bills over to the police.

We give up too much to Mr. Parr when we give up the right to have our homes and possessions reasonably protected by firemen, who, it seems to me, are hired precisely for the purpose of protecting our belongings. This was not a search for criminal evidence long after the fire was extinguished. The motion to suppress was properly denied under *Michigan v. Tyler, supra.*

Parr claims that even if the bills were admissible, the evidence was insufficient to establish his intent to defraud under 18 U.S.C.A. § 472. Parr's co-defendant, Donna Oles, testified that Parr said he had a friend who had some friends that could make him some money if he could produce a good $10. Oles testified that Parr said the bills would be passed in dark places, and that people were taking them out of the country. The evidence establishes not only that Parr possessed the counterfeit bills, but intended to utilize them to defraud others. A general intent to defraud third parties is sufficient to sustain a conviction for violation of 18 U.S.C.A. § 472. *Riggs v. United States,* 280 F.2d 750, 752 (5th Cir. 1960).

I would affirm.