**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Sidney Ray WILKERSON, Defendant-
Appellant.**

**No. 71-3357.**

United States Court of Appeals,
Fifth Circuit.

Dec. 7, 1972.

Michael L. Riddle, Dallas, Tex. (Court Appointed), for defendant-appellant.

Eldon B. Mahon, U. S. Atty., Charles D. Cabaniss, Asst. U. S. Atty., Dallas, Tex., W. E. Smith, Asst. U. S. Atty., Andrew Barr, Fort Worth, Tex., for plaintiff-appellee.

Before GEWIN, THORNBERRY and CLARK, Circuit Judges.

THORNBERRY, Circuit Judge:

This is an appeal from a conviction on all ten counts of an indictment charging possession and transfer of counterfeit currency, in violation of 18 U.S.C. §§ 472 and 473.[1] The trial court assessed concurrent sentences on all counts. The indictment alleged that appellant was involved in three transactions in 1970 and two transactions in 1971.

*The 1970 Transactions*

(A) *The Two Transfers to George Wall*: George Wall testified for the Government that Wilkerson offered to sell him some counterfeit $100 bills in 1970, and claimed to have seen Wilkerson in possession of engraving plates and sheets of printed counterfeit bills. Wall and three associates agreed to distribute the bills and turn over to Wilkerson thirty per cent of the proceeds. On February 1, 1970, Wilkerson delivered one hundred counterfeit $100 bills to Wall, and delivered forty-five more to him several days later. For each of these two deliveries, Wilkerson was convicted on one count of possession and one count of transfer.

(B) *The Transfer to Doyle Branum:* In April of 1970, Doyle Branum, a Government informer, purchased twenty counterfeit $100 bills that Wilkerson had offered him. This sale and delivery resulted in one conviction for possession and one for transfer.

*The 1971 Transactions*

The Government proved that on two occasions in 1971 Doyle Branum received counterfeit currency from Bobby Allon Vess, a co-defendant who was a fugitive from justice at the time of appellant's trial. On the first of these occasions, Vess gave Branum two counterfeit $20 bills to use as samples for inspection by a prospective purchaser of a large quantity of counterfeit twenties. After inspection, these samples were to be returned. On the second occasion, Vess gave Branum $10,000 in counterfeit twenties in exchange for $2,500 in good currency supplied by the "purchaser" (Agent Hancock of the Secret Service).

The Government relied primarily upon transcripts and tape recordings of conversations involving Branum to establish the charge that Wilkerson aided and abetted Vess in these transactions. Wilkerson participated in three of these conversations. In a taped conversation on April 2, 1971, Branum offered to help Wilkerson distribute some counterfeit currency in order to make amends for backing out of an earlier agreement among Wilkerson, Vess, and Branum.[2] On April 6, 1971, in reply to Branum's information concerning a possible buyer for counterfeit twenties, Wilkerson said that he thought he had some twenties hidden, and that he wished to sell a large quantity of them. Branum suggested the use of a sample, and Wilkerson promised to provide a bill for that purpose.[3] Wilkerson then set the price,

---

1. § 472. Uttering counterfeit obligations or securities

Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than fifteen years, or both.

§ 473. Dealing in counterfeit obligations or securities

Whoever buys, sells, exchanges, transfers, receives, or delivers any false, forged, counterfeited, or altered obligation or other security of the United States, with the intent that the same be passed, published, or used as true and genuine, shall be fined not more than $5,000 or imprisoned not more than ten years, or both.

2. Tr. 174–177.

3. Wilkerson: I think I got some [twenties] hid if they're any good. I'd like to sell a wad of em. I wouldn't want to sell a small amount.

quantity, and terms of the contemplated sale. On April 8, 1971, after calling Vess into the conversation, Wilkerson claimed that he was busy with other matters, and told Branum and Vess that they would have to make final arrangements and execute the sale and delivery of the sample. Wilkerson then departed.[4]

At this point, Wilkerson disappears from the script entirely. The remainder of the Government's case with regard to the 1971 transactions consisted chiefly of three more conversations, this time solely between Vess and Branum. The first of these occurred on April 8, 1971, immediately after Wilkerson's departure. Vess castigated Branum for dealing with Wilkerson, and Branum apologized to Vess for "going over your head."[5] This statement by Branum lent considerable support to the Government's theory that Wilkerson directed the counterfeiting operations in 1971 from start to finish. A transcript of an earlier, unrecorded conversation between Branum and Vess, however, contained statements by Vess that suggested that Vess, not

Wilkerson, was in charge. During this conversation on March 28, 1971, Vess told Branum that Wilkerson was merely a manufacturer who "does what I tell him."[6] Although these statements were in direct contradiction to the Government's view of the case, they nevertheless provided an additional link between Wilkerson's participation in the preliminary negotiations and the execution of the sale, by suggesting that the counterfeit currency involved in the 1971 transactions was supplied by Wilkerson. Although Wilkerson was not present at either the delivery of the sample or the subsequent sale, Branum testified that the sale took place at a house in the country where Wilkerson had earlier shown Branum some concealed counterfeit bills.[7]

Appellant contends that it was reversible error to admit these conversations between Branum and Vess. He also objects to the presence of a conspiracy charge in the jury instructions, claims that there was insufficient evidence of intent with regard to delivery of the

Branum: . . . [I]s there any way you could let me have one or I'll buy one. You can mark it and I'll bring it back to you and just let the man look at it, and if he likes it we can go from there.
Wilkerson: Yep, might be able to rustle you up one. I'll see if I can . . . .
Tr. 183.

4. Wilkerson: All right, I'll tell you who I'm gonna let you talk to. I'm gonna let y'all work this out, because I gotta a bunch of s——— I gotta take care of. Well, I already told Bob [Vess] . . I don't have time right now. You and him work it out. . . . You know it's the same thing and the whole works. . . . Hey Bob. [Vess arrives.]

. . . . . .

Wilkerson: I'm gonna go back in and get something to drink. . . . I'll see you later. [Wilkerson leaves.]
Tr. 193–194; 196–201.

5. Branum: I hope you didn't think I run over your head.
Vess: I explained to you the other night, Doyle, I thought I made it perfectly

clear that if you did any business you would have to do business with me.
. . .
Tr. 201.

6. Agent Hancock, who monitored and transcribed, but did not record, this conversation, testified as follows from his notes of the March 28 conversation:
Vess said, "In fact, Sid works for me, I don't work for him; he does what I tell him when I tell him and you couldn't get a damn thing from Sid . . . Sid is the manufacturer and I am the disposer; everything that goes out comes through me. Sid and I have made an awful lot of money on these twenties, more money than you can imagine."
Tr. 246. In addition, Hancock's notes suggested that Vess had apparently tried to force Wilkerson out of the partnership, telling Branum that "he was sure that he and Mr. Branum could work together without going through Sid [Wilkerson]." Id.

7. Tr. 124–25.

sample, and argues that it was improper to convict him of both possession and transfer on the basis of each individual delivery of counterfeit bills.[8]

■ At the outset we are met by the Government's argument that the concurrent sentence doctrine, announced in Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943), precludes our considering any of these alleged errors, because appellant does not challenge the convictions and concurrent sentences he received for the 1970 sale of twenty counterfeit $100 bills to Branum. We disagree. Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), held that whatever might have been the jurisprudential origins of the concurrent sentence doctrine, the rule is not a jurisdictional bar to considering the validity of a sentence which runs concurrently with one adjudicated or conceded to be valid. The Court pointed out that the collateral legal consequences of a criminal conviction will often justify discretionary appellate review of that conviction, notwithstanding the fact that a decision in an appellant's favor cannot alter the length of his confinement. In the instant case, a reduction in the number of convictions may have a significant bearing on appellant's eligibility for parole. Should he ever be convicted of another crime, enhancement of his sentence by

means of prior convictions may be substantially lessened. In addition, if appellant is called upon to give crucial testimony in some future proceeding, a reduction in the number of convictions may determine his ability to withstand impeachment. The existence of these collateral legal consequences amply justifies discretionary review of appellant's contentions in this case.

■ Therefore we turn to a consideration of appellant's allegation that the trial court erroneously admitted the statements of Vess and Branum under the "co-conspirator" exception to the hearsay rule.[9] With regard to Branum's statements, appellant's position is, first, that they did not satisfy the requirements of the federal co-conspirator exception, and, second, that their admission denied him his constitutional right to confront accusatorial witnesses. He makes the same objections with regard to Vess's statements, and claims in addition that evidence of Vess's March 28 statements is rendered inadmissible by reason of the Government's failure to electronically record these statements as required by the Omnibus Crime Control and Safe Streets Act of 1968.[10]

■ Appellant's objection to Branum's statements centers on Branum's apologizing to Vess for "going over your head,"[11] which lent indirect support to the Government's theory that Wilkerson

---

8. Appellant also claims that the use of electronically intercepted communications violated his Fourth, Fifth, and Sixth Amendment rights; but he concedes that this Circuit has previously determined that issue adversely to him. *See, e. g.,* United States v. Wilson, 5th Cir. 1971, 451 F.2d 209.

9. Although the indictment did not charge the offense of conspiracy, it is well settled that extrajudicial statements may be admitted under the co-conspirator exception regardless of the nature of the offense charged. United States v. Olweiss, 2d Cir. 1943, 138 F.2d 798, cert. denied, 321 U.S. 744, 64 S.Ct. 483, 88 L.Ed. 1047 (1944); United States v. Miller, 2d Cir., 246 F.2d 486,

cert. denied, 355 U.S. 905, 78 S.Ct. 332, 2 L.Ed.2d 261 (1957).

10. Pertinent portions of that statute require that the contents of any communication intercepted by means authorized therein be recorded, if possible, "on tape or wire or other comparable device." 18 U.S.C. § 2518(8)(a). "No evidence [obtained in violation of this requirement] may be received in evidence in any trial." 18 U.S.C. § 2515. Agent Hancock, who monitored all of the conversations in question, manually transcribed, but did not record, the March 28 conversation between Vess and Branum.

11. *See* note 5 *supra.*

was in charge of the counterfeiting operation. Assuming *arguendo* that this statement was in fact hearsay,[12] it was clearly inadmissible under the federal co-conspirator exception to the hearsay rule, because Branum was not a conspirator. Owing to the possibilities of abuse inherent in the co-conspirator exception to the hearsay rule, the courts have fashioned strict limitations upon the exception, one of which is the rule that statements are inadmissible against an accused if made by a "co-conspirator" who is actually a government agent whose sole purpose is to effect the arrest of the conspirators. Statements of one conspirator are admissible against all the others only because there is deemed to exist among conspirators a community of interest that makes each conspirator an "agent" of the others. In the case of a government agent posing as a conspirator, the community of interest ceases to exist, and with it, the basis for admitting the agent's statements. See United States v. Williamson, 5th Cir. 1971, 450 F.2d 585; United States v. Cerone, 7th Cir. 1971, 452 F.2d 274, 282, cert. denied, 405 U.S. 964, 92 S.Ct. 1168, 31 L.Ed.2d 240 (1972); United States v. Morello, 2d Cir. 1957, 250 F.2d 631.

But even though Branum's statement be inadmissible because not made by a co-conspirator, appellant's argument overlooks the fact that Branum testified at appellant's trial and was cross examined. Appellant was thus afforded the benefits guaranteed by the hearsay rule. As this court observed in United States v. Williamson, *supra*:

[T]he general rule against the admission of hearsay testimony is in large part grounded upon the absence of an opportunity to cross-examine the out-of-court declarant and to confront him on the witness stand. See 5 Wigmore, Evidence (3d Ed.) § 1362. If hearsay is to be excluded mainly for those reasons, its introduction—despite its technical inadmissibility—is not necessarily prejudicial if the declarant is afforded the opportunity to challenge in court the person whose statements have been related.

450 F.2d at 591.

Strictly because Branum testified and was cross examined by appellant, we hold that the trial judge committed no reversible error in admitting this technically inadmissible statement of Branum under the co-conspirator exception.

This conclusion also disposes of appellant's claim that the admission of Branum's statement violated his right to confront the witnesses against him. The right to confrontation seeks to insure that statements admitted against an accused will be reliable and that the jury will have the benefit of observing the demeanor of prosecution witnesses. See Dutton v. Evans, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). It is self-evident that an accused enjoys these benefits when the prosecution witness takes the stand and is cross examined.

For similar reasons, we must reject appellant's challenge to the admission of Vess's statements. Even if these statements were erroneously admitted, their prejudicial effect was insignificant in comparison to evidence already properly before the jury. Wilkerson was

---

12. A hearsay statement is an extrajudicial declaration offered to prove the truth of the matter stated. *See* McCormick, Evidence (2d Ed.) § 246. Since Branum's apology arguably was offered not to prove the "truth" of what Branum said (i. e., the apology), but rather to prove the state of mind that it reflected (i. e., Branum's notion that Wilkerson was in charge), the statement may not be hearsay at all.

charged, not with perpetrating the 1971 crimes, but with aiding and abetting their commission; and his own statements supplied convincing proof of his involvement in these transactions. He planned the delivery of the sample and the subsequent sale. He admitted having some counterfeit twenties, and stated that he wanted to sell a large quantity of them. He promised to supply the sample. He designated the terms of the sale. Vess obtained the $10,000 in counterfeit twenties from the same house in the country where Wilkerson had earlier shown some bills to Branum. On the other hand, Vess's statements for the most part merely supply additional circumstantial links between Wilkerson's role in the initial planning and his part in the execution of the delivery and sale. In fact, the only suggestion that Wilkerson might not have played any part in the 1971 transactions arises from the very evidence which appellant challenges: Vess's apparent attempt to exclude Wilkerson from the group on March 28, 1971.[13] In short, it is clear beyond a reasonable doubt that any error in the admission of this evidence was harmless. See Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972).

 Appellant next challenges his possession and transfer convictions arising out of the delivery of the sample, on the ground that all of the parties understood that the sample was to be returned after inspection by the prospective buyer, and thus that no one could have possessed or transferred the sample with the requisite intent to defraud. It is well settled that a general intent to defraud unknown third parties will suffice under these statutes, Riggs v. United States, 5th Cir. 1960, 280 F.2d 750, 752; and we have held that the requisite intent need not include an intent to defraud solely by passing, uttering, or otherwise transferring the counterfeit, Bar-

bee v. United States, 5th Cir. 1968, 392 F.2d 532. Mere possession with knowledge of the counterfeit character of the currency will not suffice, however. There must be knowing possession *and* intent to defraud someone. *Barbee, supra.* One is hard pressed to stretch the statutory requirement to cover the possession and transfer of this sample. No one intended to defraud the prospective buyer, because everyone knew that he wanted to examine a specimen of counterfeit. Nor could the delivery of the sample have been intended to defraud some unknown third party further down the chain of distribution, because that chain was to stop with the prospective buyer's inspection. Unless we are prepared to ignore the plain wording of the statute, we must agree with appellant that the requisite intent to defraud was absent from the sample transaction. The Government would find intent here because the sample was used in furtherance of the sale of five hundred counterfeit twenties, which clearly displayed the requisite intent. But appellant was charged and convicted separately for his part in that transaction, and the Government is entitled to only one bite of that apple.

 Next, appellant argues that his participation in each of the five transactions could not properly be punished by convictions for both possession and transfer, because the proof necessary to support one conviction was identical to that necessary to support the other. If appellant's premise is valid, then Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), precludes his conviction for both possession and transfer with regard to each of the five transactions. But appellant's premise is not valid. With regard to his sales to both Wall and Branum in 1970, both witnesses testified that Wilkerson had claimed possession of counterfeit bills long prior to his actual delivery to the buyers.[14] We have held

13. *See* notes 5 and 6 *supra.*

14. Tr. 38–40; 119–120.

that such proof is sufficiently distinct from proof of a later transfer as to warrant convictions for both possession and transfer. McMurtry v. United States, 5th Cir. 1943, 139 F.2d 482, cert. denied, 321 U.S. 783, 64 S.Ct. 635, 88 L.Ed. 1075 (1944). The two convictions arising from the 1971 sale were also supported by distinct elements of proof. Thus, in support of the charge that appellant aided and abetted the possession of counterfeit, the Government introduced circumstantial proof that Wilkerson supplied the counterfeit. In support of the charge that he aided and abetted the transfer, the Government proved that Wilkerson set up the terms of the sale and called Vess into the negotiations.[15]

■ Finally, appellant argues that he was prejudiced by the presence in the court's charge of an extensive definition of conspiracy, since the offense of conspiracy was not charged in the indictment. Although the better practice would have been to state clearly to the jury that they could not convict appellant for conspiracy, and that the conspiracy instruction was present merely to help them understand a rule of evidence (i. e. the co-conspirator exception to the hearsay rule), the mere presence of this instruction did not, in the circumstances of this case, constitute reversible error.

With the exception of appellant's convictions arising out of the 1971 delivery of the sample (Counts 7 and 8), the judgment of the district court is affirmed. As to Counts 7 and 8, we reverse and remand with directions that the indictment be dismissed.

Affirmed in part; reversed in part.

---

15. Appellant also claims that the two deliveries to Wall in 1970 constituted only one transaction, thus leaving only *four* separate transactions. Again, we reject this claim because distinct elements of proof were introduced as to each delivery: e. g., difference in time; appellant's printing additional bills prior to the second delivery.