UNITED STATES of America,
Plaintiff-Appellee,

v.

Elmer Joseph CRACHY,
Defendant-Appellant.

No. 85–1543.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 24, 1986.

Decided Sept. 3, 1986.

---

David M. Hall (argued), Black, Hall, Nicewander & Kladder, Jenison, Mich., for defendant-appellant.

Charles E. Chamberlain, Jr., Asst. U.S. Atty. (argued), Grand Rapids, Mich., for plaintiff-appellee.

Before LIVELY, Chief Judge, and MERRITT and NELSON, Circuit Judges.

PER CURIAM.

Indicted on three counts of possessing and selling counterfeit currency, Elmer Joseph Crachy was acquitted on one count and convicted on the other two. Both counts on which he was convicted involved the same packet of 143 counterfeit $50 bills; one conviction was for possession of the counterfeit money in violation of 18 U.S.C. § 472, and the other was for selling it in violation of 18 U.S.C. § 473. Mr. Crachy received prison sentences for both offenses, the terms to run concurrently. The most significant of the several questions raised in this appeal is whether the two offenses of which Mr. Crachy was convicted really constituted a single criminal act for which only one term of imprisonment would be permissible. Having concluded that the evidence shows two distinct courses of criminal conduct, and finding no merit in the other claims of error, we shall affirm the conviction and allow both sentences to stand.

I

Around Christmastime of 1979 Mr. Crachy's 17 year old nephew found the keys to a footlocker secreted in a room Mr. Crachy had boarded off in the basement of his house. In the footlocker Mr. Crachy kept a number of boxes of currency of his own manufacture. The nephew helped himself to a few bills out of each box, passed some of them, and was arrested, tried and convicted.

By taking bills from different boxes, the nephew "busted all the numbers"; Mr. Crachy could not tell what numbers were on the bills the nephew had taken. Apparently to protect the nephew—who had refused to implicate his uncle—Mr. Crachy "didn't push none of [the remaining bills]" until early in 1983. His inventory of counterfeit money was placed in plastic containers that he buried in various locations in Michigan (where he lived), Illinois, Indiana, and Wisconsin. "I never put all of my eggs in one basket," he explained in the course of a conversation surreptitiously tape recorded by a government informant.

The informant, one Charles Acker, was a man with an impressive criminal record.

In July of 1981, while various criminal charges were pending against him, Mr. Acker jumped bond and "went on the lam or went underground," as he testified. Agents of the Federal Bureau of Investigation eventually got word to him that he might find it advantageous to turn himself in, and in mid–1983, mindful that he might otherwise have to spend the rest of his life in prison as an habitual offender, Mr. Acker became an undercover informant.

Receiving information, as he testified, that Mr. Crachy (an old acquaintance) might have counterfeit money available for sale, Mr. Acker passed that intelligence on to the Secret Service and the FBI. They asked him to call Mr. Crachy and try to arrange a meeting. Mr. Acker did so and met with Mr. Crachy for approximately two hours on March 1, 1983. Mr. Acker's tape recording equipment malfunctioned, and the only evidence of what transpired was Mr. Acker's testimony at the trial.

Mr. Acker testified that he "told [Mr. Crachy] that I had been out passing counterfeit and I was interested in purchasing some if I could get it." Mr. Crachy replied that "he'd see about it," and the two men agreed to meet the next morning.

The recording equipment was working better the next morning, and a tape of that meeting is part of the record in this case. The men discussed a wide variety of subjects, including various techniques for passing counterfeit currency, the nephew's theft from Mr. Crachy's footlocker, and two bills that Mr. Crachy had "dug up" and was carrying with him. The tape suggests that Mr. Acker was permitted to borrow the two bills, promising to bring them back later.

The men had a final meeting on April 20, 1983, and their conversation was again recorded. The tape discloses that Mr. Acker offered Mr. Crachy $1,000 for $5,000 in counterfeit money. Mr. Crachy responded that the money was buried in different places and he did not know how much was readily available, but he agreed to leave the bar where they were talking and "go pick that stuff up and come back." Mr. Crachy returned twenty minutes later with a supply of $50 bills. All of them, as was noted in the taped conversation, had the same serial number. The men discussed the color of the bills at some length and talked about a bank stamp that Mr. Crachy had put on some of the bills to lend them verisimilitude. The money was somewhat haphazardly counted, Mr. Crachy saying "I'm giving you a lot more than what you are supposed to get." Mr. Crachy repeatedly remarked on the dampness of the bills, explaining "they were in the ground," and Mr. Acker commented that they smelled of earth.

Mr. Acker gave the bills (143 in number) to the Secret Service, and they were received in evidence at the trial. It was stipulated that they were counterfeit.

Some three months before the start of the trial, the U.S. Attorney's Office gave Mr. Crachy's lawyer a typewritten transcript of the tapes and told him that the tapes were available for him to listen to. The government said it planned to use portions of the tapes at the trial, but did not specify which portions.

On the first day of trial, after the jury had been selected but before opening statements, the government identified the portions it intended to use. In a conference conducted by the court out of the presence of the jury Mr. Crachy's lawyer objected to any use of the tapes, contending that they were hard to understand and inaudible in places. He argued further that if they were to be used, there should be a redaction of passages dealing with an attempted bank robbery for which Mr. Crachy had been imprisoned, passages in which Mr. Crachy spoke of having passed counterfeit money and engaged in other illegal conduct in the past, and passages relating to the activities of Mr. Crachy's nephew.

The court did not rule immediately, but expressed some skepticism about the claim that the inaudible portions of the tapes were so extensive that none of the tapes could be used. The government asked for a stipulation as to audibility. Defense counsel then conferred privately with Mr.

Crachy, advised him of the guidelines set forth in *United States v. Robinson*, 707 F.2d 872 (6th Cir.1983), and reported back to the court and the prosecutor that "we're in a position to stipulate that the tape is audible and admissible on that threshold ground subject to our determining the other issues that—."

The court interrupted at this point, the jury apparently having been waiting for some time, and suggested that they start the trial with a view to discussing the remaining issues later. Mr. Crachy's lawyer agreed, and the court called the jury and began the trial. At the end of the day, after the jury had been excused, the court asked Mr. Crachy's lawyer for his suggestion with respect to the tapes.

The lawyer replied that since the audibility of the tapes had been stipulated, he wanted to identify the portions of the typewritten transcripts which he considered objectionable. Before that was done, the court asked what use would be made of the typewritten transcripts at the trial. It was agreed that they should be made available to the jury for use as a guide while listening to the tapes being played. It was also agreed that the tape of the first meeting, on March 1, 1983, should not be played to the jury, most of it being inaudible.

With respect to the tapes of the March 2d meeting, Mr. Crachy's lawyer objected to portions dealing with the nephew's theft from the footlocker; the attempted bank robbery; a close call Mr. Crachy had experienced in trying to pass counterfeit currency at a checkout lane; and a passage in which Mr. Crachy pointed to a gas station in which his "own kid" had passed a counterfeit bill and his license plate number had been noted.

The government agreed to the exclusion of the conversation about the bank robbery, but urged that the discussions relating to counterfeit bills were relevant and should be retained.

Turning to the tape of the April 20 meeting, Mr. Crachy's lawyer objected to several passages that the government agreed to redact, and to seven passages that the government said it wanted to retain. For the most part these passages contained conversation about pushing counterfeit money or burying it in the ground, plus the activities of the nephew.

The court ruled that portions dealing with Mr. Crachy's prior experience in manufacturing and passing counterfeit currency would be admitted under Rule 404(b) of the Rules of Evidence for the purpose of proving intent, opportunity, and lack of mistake in connection with the offenses charged. The court refused, however, to let the government present an abbreviated version of the tapes that would have excluded a substantial body of material not, by itself, incriminating. The court suggested—correctly, we believe—that if the five or six hours of taped conversations were played substantially in their entirety, the evidence of prior bad acts would not be highlighted and potential prejudicial effect would thereby be lessened somewhat.

The trial proceeded, with Mr. Acker testifying at some length, the edited tapes of the conversation of March 2 and April 20 being played to the jury *in extenso*, and the jury being permitted to follow the tapes with similarly edited typewritten transcripts. The transcripts were not offered in evidence, but the jury having seen them, it is appropriate that this court should see them too.

Mr. Crachy did not take the stand, but, at the request of his counsel, the court charged the jury on the defense of entrapment. The jury was told that although the entrapment defense did not apply to the possession charges, Mr. Crachy had asserted that he was a victim of entrapment with respect to the count charging him with the sale of the counterfeit money. Mr. Crachy could not be convicted on that count, the court charged, if he had no previous intent to violate the law and was induced or persuaded to do so by Mr. Acker. The jury was instructed that if, through cross-examination of the government's witnesses, the defendant established that the government's conduct created a substantial risk that the offense would be committed by a

person not otherwise ready to commit it, "the government must, if it is to prevail, prove beyond a reasonable doubt that the defendant was predisposed to commit the crimes charged." The entrapment charge concluded with these words: "The burden is on the government to prove beyond a reasonable doubt that the defendant was not entrapped."

The jury brought in a verdict of "not guilty" on the count charging Mr. Crachy with possession of two counterfeit bills on or about March 2, 1983, and "guilty" on the counts charging him with having kept 143 counterfeit bills in his possession on or about April 20, 1983, and with having knowingly sold and delivered the bills on or about that date. Mr. Crachy was sentenced to imprisonment for a period of twelve years as to the possession count and eight years as to the sale and delivery count, the terms to run concurrently.

We are asked to consider five assignments of error and to rule on a motion filed by the government to supplement the joint appendix with the typewritten transcript that the jury used as a guide while listening to the tapes.

## II

### A.

Relying primarily on *United States v. Terry*, 729 F.2d 1063 (6th Cir.1984), and *United States v. Reed*, 647 F.2d 678 (6th Cir.), *cert. denied*, 454 U.S. 837 & 1037, 102 S.Ct. 142 & 580, 70 L.Ed.2d 118 & 483 (1981), Mr. Crachy argues first that the "evidence of prior bad acts and/or other criminal conduct by defendant" that was admitted pursuant to Rule 404(b) of the Federal Rules of Evidence should have been excluded. We do not find this contention persuasive.

Possession of counterfeit money is not a crime, under 18 U.S.C. § 472, unless it is possessed "with intent to defraud." Similarly, the delivery of counterfeit money is not a crime under 18 U.S.C. § 473 unless it is delivered "with the intent that the same be passed, published, or used as true and

genuine...." The element of intent was of critical importance in this case, and the evidence of Mr. Crachy's dealings in counterfeit money was highly relevant to that issue. "All relevant evidence is admissible," under Rule 402, except as otherwise provided. Rule 404(b) makes evidence of other crimes inadmissible to prove the actor's character, but subject to that exception the rule affirms that such evidence may be admissible for such purposes as proving "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

■ The key word here is "intent." If Mr. Crachy had knowingly passed counterfeit money before; if he had knowingly kept a supply of it hidden in a locked footlocker; and if, after samples had been removed by his nephew, he had kept his remaining stock out of circulation for three years solely because of fear that the serial numbers on the bills would prove identical to those on the bills passed by his nephew, those facts could unquestionably have been helpful to the jury in determining the intent with which Mr. Crachy kept the bills in his possession and the intent with which he turned them over to Mr. Acker. Unlike the evidence of unrelated crimes which this court held inadmissible in *United States v. Blankenship*, 775 F.2d 735 (6th Cir.1985), the tapes of Mr. Crachy's conversations about counterfeit money were not offered to negate the defense of entrapment by providing "insight into the sort of person the defendant is." 775 F.2d at 740. The evidence in question here was offered not to show bad character in general, but to show—very directly—the specific intent without which the possession or transfer of counterfeit currency is not criminous. In neither *Terry* nor *Reed* was the trial court held to have abused its discretion in admitting evidence of prior past acts for purposes authorized under the last sentence of Rule 404(b), and no such abuse of discretion occurred here.

It is impossible to tell from the tapes precisely when some of Mr. Crachy's past counterfeiting activities occurred, but the

activities in question were so closely related to the crimes charged that the failure of the tapes to pinpoint the time of the acts did not entitle Mr. Crachy to keep the jury from knowing about them at all.

■ There were fleeting references in the material objected to from which an astute jury might have divined that Messrs. Crachy and Acker had known one another in prison, but similar hints are also contained in portions of the tapes not objected to. The trial court's attention was not specifically invited to what the tapes said about Mr. Crachy's experiences "inside," and if any error did occur in this connection, it was harmless in view of the overwhelming evidence of Mr. Crachy's guilt.

**B**

Mr. Crachy's next contention is that the tape recordings should have been excluded altogether because they "did not include a complete record of all the transactions and/or conversations between the defendant and informant Acker; they are partial and incomplete." This claim has no merit. Mr. Crachy's problem with the tapes is not that they contain too little, but too much.

**C**

■ It is urged that the tape recordings "should have been sealed by the trial court as is provided for in 18 U.S.C. 2518(8)(a)." The trial court was not favored with any such suggestion, however, and the statute cited does not apply here in any event; it deals with recordings made under court orders authorizing the interception of wire or oral communications, and no such court order was obtained or needed here. Mr. Acker's consent to the interception obviated the necessity of getting a court order. 18 U.S.C. § 2511(2)(c).

**D**

■ The fourth issue raised on appeal is whether the court erred in refusing to charge the jury that entrapment could be a defense to the possession charges. There was no error in this respect. There was not a scintilla of evidence suggesting that the government somehow put it in Mr. Crachy's mind that he should go about the countryside burying counterfeit currency. That was Mr. Crachy's idea, not Mr. Acker's, and Mr. Crachy conceived that idea long before Mr. Acker came back into his life in 1983.

**E**

■ The final issue is whether Mr. Crachy should have been convicted and sentenced both for possessing the counterfeit currency on or about April 20, 1983, and for delivering it to Mr. Acker on the same date.

The fact that the two sentences are to run concurrently rather than consecutively does not resolve the question, because the number of convictions may have a significant bearing on eligibility for parole. *United States v. Wilkerson,* 469 F.2d 963 (5th Cir.1972), *cert. denied,* 410 U.S. 986, 93 S.Ct. 1515, 36 L.Ed.2d 184 (1973). We must therefore determine whether Mr. Crachy was really guilty of two offenses, or whether the offenses of which he was convicted merged into a single crime.

We start with the proposition that the indictment was not multiplicitous. See *United States v. Hairrell,* 521 F.2d 1264 (6th Cir.), *cert. denied,* 423 U.S. 1035, 96 S.Ct. 568, 46 L.Ed.2d 409 (1975), where, as here, the defendant possessed a single cache of counterfeit bills that he delivered to a government informer in a single transaction. We held in *Hairrell* that "[t]he charges of possession and transfer clearly related to separate offenses and are not multiplicitous." 521 F.2d at 1266.

Although the defendant in *Hairrell* was convicted on multiple counts, he was only sentenced on one. In *United States v. Sanford,* 673 F.2d 1070 (9th Cir.1982), by way of contrast, the Court of Appeals for the Ninth Circuit ordered resentencing for a defendant who had been sentenced to consecutive terms of imprisonment for possessing counterfeit notes and delivering them. The evidence showed that the government informant in *Sanford* obtained

counterfeit bills from the defendant, but there was no evidence showing that the defendant had possessed the notes "at any time prior to the moment of transfer;" therefore, the *Sanford* court held, "[o]n the facts of this case, the two offenses charged were in reality only one offense for which consecutive sentences are improper." 673 F.2d at 1071.

In *United States v. Stevens*, 521 F.2d 334 (6th Cir.1975), similarly, we held that a defendant who was properly convicted on one count of possessing heroin in violation of 21 U.S.C. § 841(a)(1) and one count of distributing the same heroin in violation of the same section could not be required to serve two concurrent sentences. The evidence in *Stevens*, as far as the opinion discloses, was like that in *Sanford;* there was no indication of possession by the transferor at any time prior to the moment of transfer.

In *United States v. Wilkerson*, 469 F.2d 963, *supra*, on the other hand, the evidence showed that the defendant had claimed possession of counterfeit bills "long prior to his actual delivery to the buyers." *Id.* at 969. Citing its earlier decision in *McMurtry v. United States*, 139 F.2d 482 (5th Cir.1943), *cert. denied*, 321 U.S. 783, 64 S.Ct. 635, 88 L.Ed. 1075 (1944), the Court of Appeals for the Fifth Circuit held that "such proof is sufficiently distinct from proof of a later transfer as to warrant convictions for both possession and transfer." *Id.* at 970.

The evidence in the case at bar makes this case more like *Wilkerson* than like *Sanford* and *Stevens*. The 143 counterfeit bills delivered to Mr. Acker came from a cache that had been buried so long that Mr. Crachy could not even remember how much money was there until he went back and dug it up. The money had taken on the very smell of the earth in which it had so long been hidden. The crime of possession came to an end on the same day on which the crime of delivery occurred, to be sure, but that was not when Mr. Crachy's possession began.

Mr. Crachy possessed the money on the day, long past, when it was buried, as well as on the day it was disinterred—and throughout the period when the counterfeit money was under his control, Mr. Crachy was guilty of and subject to punishment for one crime only. "[B]y prohibiting possession, Congress intended to punish as one offense all of the acts of dominion which demonstrate a continuing possessory interest in [the contraband.]" *United States v. Jones*, 533 F.2d 1387 (6th Cir.1976), *cert. denied*, 431 U.S. 964, 97 S.Ct. 2919, 53 L.Ed.2d 1059 (1977). The long possession having constituted one offense, we do not think it violated the intent of Congress for Mr. Crachy to be subjected to a separate penalty when he resurrected the corpus delicti, as it were, and committed the separate crime of transferring the counterfeit bills to the buyer, Mr. Acker.

We find nothing to the contrary in *Ball v. United States*, 470 U.S. 856, 105 S.Ct. 1668, 84 L.Ed.2d 740 (1985), where the Supreme Court held that a felon could not be convicted and concurrently sentenced under 18 U.S.C. § 922(h)(1) for receiving a firearm and under 18 U.S.C. § 1202(a)(1) for possessing the same weapon. It was conceded in *Ball* that the charge of receiving the firearm rested on the same conduct as the charge of possessing it once it had been received. 470 U.S. at ——, 105 S.Ct. at 1669, 84 L.Ed.2d at 743. To determine whether Congress intended that this conduct be punishable under each of two different statutes, the court applied the test of *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932): "whether each provision requires proof of a fact which the other does not." "The assumption underlying the *Blockburger* rule," the court said in *Ball*, "is that Congress ordinarily does not intend to punish the same offense under two different statutes." 470 U.S. at ——, 105 S.Ct. at 1672, 84 L.Ed.2d at 746. Applying *Blockburger* to the firearm statutes, the court concluded

"it is clear that Congress did not intend to subject felons to two convictions; proof of illegal receipt of a firearm *nec-*

*essarily* includes proof of illegal possession of that weapon. '[W]hen received, a firearm is necessarily possessed.' *United States v. Martin*, 732 F.2d 591, 592 (CA7 1984) [footnote omitted]. In other words, Congress seems clearly to have recognized that a felon who receives a firearm must also possess it, and thus had no intention of subjecting that person to two convictions for the same criminal act." 470 U.S. at ——, 105 S.Ct. at 1672, 84 L.Ed.2d at 746 (emphasis in original).

While one cannot receive contraband without possessing it, proof of receipt thus necessarily constituting proof of possession, it is entirely possible to possess contraband without transferring or delivering it. There is an obvious difference between keeping inventory on the shelf and transferring it to a customer. Proof of the former does not *"necessarily"* include proof of the latter, and where an illegal transfer of counterfeit currency occurs after what is shown to have been a significant period of illegal possession by the transferor, it does not violate the intent of Congress to punish the transferor for the transfer and the possessor for the possession notwithstanding that the transferor and the possessor happen to be the same person.

The government's motion for leave to supplement the joint appendix by inclusion of the typewritten transcripts of the tape recordings is GRANTED, and the judgment of the trial court is, in all respects, AFFIRMED.