9 F.3d 110
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Frederick P. JOSEPH, Defendant-Appellant.
 No. 93-5218.
 United States Court of Appeals, Sixth Circuit.
 Nov. 2, 1993.
 
 Before: MARTIN and NORRIS, Circuit Judges; and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendant-appellant, Frederick P. Joseph, appeals his conviction for violating 18 U.S.C. Sec. 472 for possession of counterfeit money with the intent to defraud. For the following reasons, we affirm the judgment of the district court.
 
 I.
 
 2
 After several counterfeit bills surfaced in the Lexington, Kentucky area in early June 1992, the United States Secret Service initiated an investigation which led to the girlfriend of Robert Langley. Special Agent Helminski of the United States Secret Service tracked down Langley through Langley's lawyer and attempted to question Langley's girlfriend. Special Agent Helminski told Langley that he was "interested in the source" of the counterfeit money more than in Langley, and Langley told Helminski that the source was defendant.
 
 
 3
 In order to corroborate what Langley told him, Helminski consensually tape recorded a conversation between defendant and Langley in which Langley told defendant that he wanted to buy some marijuana stolen from a marijuana field. Defendant initially said, "You're talking to the wrong guy. I don't want to buy it. I'm not interested in buying." Langley told defendant to think about it and that Langley would call him the next day, whereupon the conversation continued as follows:
 
 Defendant ("FJ"):
 
 4
 Well, right now, I'm pushing for money right now. That's why I can't do it.
 
 Langley ("RL"):
 
 5
 I figured we'd do it like I was going to last time.
 
 
 6
 FJ: Oh, you want to use that stuff?
 
 
 7
 RL: Yeah.
 
 
 8
 FJ: Well, hell, if you can use that ...
 
 
 9
 RL: I can use that easily.
 
 
 10
 FJ: Well, you told me that on the last one.
 
 
 11
 RL: Well, see, the last time I jumped in and didn't know where I was going. I've done seen this. He's got it in trash bags, hid it in the back of his yard.
 
 
 12
 FJ: Well, if you can get it and put it in your trash bags and go get it, then I'll go for it, but otherwise, you know, now just like on that last deal, I don't want no part of it.
 
 
 13
 RL: I understand.
 
 
 14
 FJ: That last deal, you know, I don't uh--, the way you pulled that off was extremely bad. I couldn't believe anybody would even do something like that, as dumb as that. That's the dumbest thing I ever heard of.
 
 
 15
 RL: Yeah, (inaudible). Yeah, he wants a thousand a pound. He's got five pounds right now and he's getting more. And I figured I'd take forty-eight hundred of the funny stuff and put two hundreds, one on each, one on top and one on the bottom. And then ... he's dumber than a rock.
 
 
 16
 FJ: If he's that dumb.
 
 
 17
 RL: He stays stoned all the time.
 
 
 18
 FJ: Well, if he stays stoned, he'll never know the difference. All you gotta do is, all you gotta do is just flash 'em and say, here's five thousand, just count 'em out. Just count 'em out. You don't even have to use good stuff. All you have to do is count five out and lay 'em in piles, ten piles--or five piles, ten to the pile. Say here it is, then fold it up and throw it in an envelope, say here you go.
 
 
 19
 RL: All right. Well, I don't get off work till about 1:15. So I guess I'll need to call you in the morning when I wake up.
 
 
 20
 FJ: Yeah. Call me in the morning and try to stop by here and I'll have a pile set for you.
 
 
 21
 RL: All right.
 
 
 22
 FJ: All right.
 
 
 23
 RL: Later buddy.
 
 
 24
 (emphasis added). From this conversation, the government concluded that it was apparent that although defendant did not want to buy marijuana with real money, when he realized that Langley meant to use counterfeit currency ("Oh, you want to use that stuff?"), he was definitely interested and said he would have a pile of money ready.
 
 
 25
 After the tape recorded telephone conversation corroborated Langley's information that defendant was the source of counterfeit currency which had been appearing in the Lexington area since early June 1992, Special Agent Helminski obtained a federal search warrant for defendant's residence, which was executed on September 2, 1992. Helminski and Special Agent Jim Burch knocked on the door and identified themselves as special agents for the U.S. Secret Service with a search warrant for the residence. Defendant told them they did not need a warrant and signed a consent to search form, but denied knowledge of any counterfeit currency.
 
 
 26
 During the search, 50 counterfeit one-hundred dollar bills were found in a suit jacket in the closet in defendant's bedroom. Helminski asked defendant where he got the counterfeit currency, and he said he was holding it for George Ray and that he had gotten the counterfeit currency from George Ray in December 1991. Defendant was asked if he had any more counterfeit currency, and he replied, "no."
 
 
 27
 A second stack of 50 counterfeit one-hundred dollar bills was then found in another suit coat in the same closet. Government's exhibits 2 and 3 were the two stacks of 50 counterfeit one-hundred dollar bills, which were sent for fingerprint analysis. Seven latent fingerprints of value were found on the bills, and one bill had the thumb print of defendant.
 
 
 28
 On October 1, 1992, defendant was indicted on a single count indictment returned in the United States District Court for the Eastern District of Kentucky for violating 18 U.S.C. Sec. 472 for possession of falsely made, forged and counterfeited obligations of the United States with intent to defraud.
 
 
 29
 At trial, which began on November 16, 1992, Special Agent Helminski looked at the counterfeit bills obtained from defendant's residence and verified that they all had one of the same three recurring serial numbers. Helminski explained that all genuine United States currency has separate serial numbers, and that the counterfeit currency appearing in Lexington had the same three recurring serial numbers. All the counterfeit currency to which he was referring was made on an office machine copier, as opposed to a printing press.
 
 
 30
 A friend of defendant, Mike McMenama, testified that he had renewed an acquaintence with defendant in April 1992 and observed counterfeit currency in defendant's bedroom. Mr. McMenama testified that defendant explained to McMenama that it was "funny money," which defendant and George Ray had made. Defendant gave McMenama nine or ten of the counterfeit one-hundred dollar bills, without any instructions or directions to be careful with it, or to be certain it was not given to any unsuspecting persons. McMenama testified that the bills he saw on that occasion were similar to the counterfeit bills contained in government's exhibit 4, which contained four counterfeit one-hundred dollar bills, two of which were obtained by Special Agent Helminski from the Kroger Store on Euclid Avenue in Lexington on August 26, 1992, and two of which were obtained by Special Agent Helminski from the manager at Diversions Night Club in Lexington on August 18, 1992.
 
 
 31
 McMenama and Langley, who were both given immunity, testified that they saw defendant with similar counterfeit bills at River Downs Racetrack, although no counterfeit bills were passed there. McMenama had also seen counterfeit currency in defendant's suit coat in his closet.
 
 
 32
 McMenama and Langley also testified that they and defendant had agreed to try to pass counterfeit currency in the black section of town by buying drugs with it, and then reselling the drugs for real money, and splitting the money. They testified that this plan was partially carried out when they purchased drugs with counterfeit currency provided by defendant. However since they ingested the drugs rather than selling them, no real money was ever obtained to be split with defendant. Langley testified that he used counterfeit money given to him by defendant to attempt to buy drugs on between two and five occasions.
 
 
 33
 Helminski, on cross-examination, was questioned concerning the investigation and his involvement with Langley and McMenama, who were given immunity to testify against defendant.
 
 
 34
 On November 17, 1992, the jury returned a guilty verdict against defendant. On November 24, 1992, defendant filed motions for a judgment of acquittal and a motion for a new trial, which the district court denied on December 4, 1992. Defendant was sentenced to a term of imprisonment of 24 months on February 3, 1993. This timely appeal followed.
 
 II.
 
 35
 Defendant contends he was entitled to a judgment of acquittal based on insufficiency of the evidence. He argues that there was insufficient evidence of an intent to defraud because the only evidence came from the testimony of the government's immunized witnesses and that the testimony of "co-conspirators" alone is not always sufficient to support evidence of intent to defraud in counterfeiting cases. United States v. Lang, 589 F.2d 92 (2nd Cir.1978).
 
 
 36
 The standard of review for claims of insufficient evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). As this court stated in United States v. Vannerson, 786 F.2d 221 (6th Cir.), cert. denied, 476 U.S. 1123 (1986), "A defendant claiming 'insufficiency of the evidence bears a very heavy burden.' On review, all evidence must be construed in a manner most favorable to the government. Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt." Id. at 225 (citations omitted).
 
 
 37
 In the present case, defendant's contention that the only evidence of an intent to defraud is based on McMenama's and Langley's immunized testimony is not true. In the tape recorded telephone conversation between defendant and Langley, defendant himself told Langley that Langley did not need to use any legitimate money (the "good stuff") to buy drugs if the person from whom he was buying was always stoned. Defendant stated, "He'll never know the difference," and then told Langley he would have a pile of counterfeit for Langley the following day, indicating that the counterfeit currency he possessed on that date was possessed with the intent to defraud someone. There is no requirement that a defendant, who is charged with possessing counterfeit currency, must have the intent to defraud a particular person. United States v. Wilkerson, 469 F.2d 963, 969 (5th Cir.1972), cert. denied, 410 U.S. 986 (1973) ("it is well settled that a general intent to defraud unknown third parties will suffice").
 
 
 38
 For this reason, defendant's argument that there is insufficient evidence of an intent to defraud has no merit. Moreover, there was evidence that counterfeit currency was observed in defendant's bedroom by Mike McMenama in April, 1992, and that defendant explained it as "funny money," which he and George Ray had made. Evidence was also submitted that defendant, McMenama, and Langley agreed to try to pass counterfeit currency in the black section of town by buying drugs with it, and then reselling the drugs for real money, and splitting the money, and that this plan was partially carried out when drugs were purchased with counterfeit currency provided by defendant. Although the drugs were ingested by Langley and McMenama, and no real money was ever obtained to be split with defendant by the sale of drugs, this is sufficient evidence to prove that he knowingly possessed the counterfeit currency with the intent to defraud. The jury could logically infer that the drug dealer from whom the drugs were purchased with counterfeit currency would then, either knowingly or unknowingly, pass that counterfeit currency on to other persons. For these reasons, the district court is affirmed on this issue.
 
 III.
 
 39
 Defendant also contends that the district court erred in denying defendant's motion for a mistrial because of the reference to George Ray's willingness to take a lie detector test.
 
 
 40
 At trial, during his cross-examination, Secret Service Agent Helminski was asked if defendant had stated that he got the counterfeit money from George Ray. Helminski replied, "That's correct." The following exchange then occurred:
 
 
 41
 Q. Without saying anything that he may have told you, have you conducted any investigation regarding George Ray?
 
 
 42
 A. Yes, sir, we have.
 
 
 43
 Q. You did request that he come into your office and speak to you?
 
 
 44
 A. Yes, sir.
 
 
 45
 Q. You did request that he come in and answer some questions and submit to fingerprint testing?
 
 
 46
 A. That's correct.
 
 
 47
 Q. He did not show up at your office, did he?
 
 
 48
 A. No, I believe he did. Agent Burch spoke with him. I was on a protective detail.
 
 
 49
 Q. But you haven't spoken with him?
 
 
 50
 A. No, as a matter of fact, he is scheduled for a polygraph exam a couple days from now.
 
 
 51
 Q. You testified earlier about the fingerprints that you requested. Have you requested any finger--fingerprint analysis from George Ray?
 
 
 52
 A. It is going to be requested, yes.
 
 
 53
 Q. But you haven't done that yet?
 
 
 54
 A. No, not as yet. The investigation is still continuing on him. As a matter of fact, he even consented to a search of his residence as well for what he may have possession of a copy machine, and that wasn't found there.
 
 
 55
 Defendant's attorney failed to object to the reference to Ray's scheduled polygraph test at the time of the testimony. No objection to that testimony occurred until the following day, at which time the district court did not even recall any testimony about a polygraph. Defendant's motion for a mistrial because of the polygraph reference was overruled. The issue was revisited in defendant's post-trial motion for a new trial, but the court overruled this motion as well.
 
 
 56
 Defendant argues that Helminski's unsolicited response in regard to the polygraph exam was a self-serving, prejudicial comment and that it is well-established that testimony about or evidence of polygraph testing is inadmissible. See United States v. Fife, 573 F.2d 369, 373 (6th Cir.1976), cert. denied, 430 U.S. 933 (1977).
 
 
 57
 The government argues that Agent Helminski's testimony regarding George Ray's scheduled polygraph examination was only a passing reference to a scheduled polygraph test of another potential suspect in criminal activity. The government contends that Helminski did not refer to the results of any polygraph tests nor did he infer that defendant had taken such a test, refused to take a text, or that defendant had even been requested to take a test.
 
 
 58
 Because defendant's attorney failed to make a contemporaneous objection to the remark, his failure to object constitutes a waiver of objection on appeal absent plain error. United States v. Meyers, 952 F.2d 914, 917 (6th Cir.), cert. denied, 112 S.Ct. 1695 (1992). Plain error is an error that "seriously affect(s) the fairness, integrity or public reputation of judicial proceedings." United States v. Young, 470 U.S. 1, 15 (1985). The plain error exception to the contemporaneous objection rule is to be used sparingly and only to prevent a miscarriage of justice. Id.
 
 
 59
 The district court's refusal to grant a mistrial because of the mere passing reference to a scheduled polygraph examination for another potential suspect did not constitute plain error because it did not "seriously affect the fairness, integrity, or public reputation" of defendant's trial. This court in United States v. Murray, 784 F.2d 188 (6th Cir.1986), stated, "We do not hold that under any and all circumstances in every case where the words 'polygraph examination' are mentioned, a grant of a new trial would be required." Id. at 189 (emphasis in original). In United States v. Walton, 908 F.2d 1289, 1292-93 (6th Cir.), cert. denied, 498 U.S. 906 (1990), this court upheld the district court's refusal to grant a motion for a mistrial following a contemporaneous objection to a witness's reference to the fact that he had taken a polygraph test. This court relied on the fact that there was no suggestion of government misconduct and that the witness's statement did not pertain to whether the defendant had taken or refused to take a polygraph, but only to a witness having taken a polygraph test.
 
 
 60
 A similar rationale applies in the present case. Ray was not a witness at defendant's trial, and there was no indication he was a co-defendant. He had not been indicted or charged by a complaint. If he had wanted to do so, defendant could have subpoenaed Ray to testify. Defendant never offered to telephone Ray in order to corroborate his statement that Ray was the source of the counterfeit money, as Langley had done with defendant. Furthermore, Ray had allowed a search of his residence and no counterfeit money was found. For these reasons, plain error did not occur and the district court is affirmed on this issue.
 
 IV.
 
 61
 Defendant's final assignment of error is that the district court erred in failing to give his tendered entrapment instruction to the jury.
 
 
 62
 Because defendant's counsel failed to request the entrapment instruction, which was tendered before trial, the standard for review by this court is whether it was plain error for the trial court to fail to so instruct the jury. United States v. Frazier, 936 F.2d 262, 266 (6th Cir.1991). In spite of defendant's counsel's assertion that there never was a formal Rule 30 conference, the record indicates that the court provided the proposed jury instructions to all counsel before the case was to be argued and gave counsel an opportunity to object to the proposed instructions. For example, when defendant's counsel requested a misdemeanor instruction under U.S.C. Sec. 492, he stated: "If we are going to have a Rule 30 conference ..., I think ... we're entitled to an instruction on misdemeanor offense...." Counsel for the government then objected to the giving of the lesser included instruction, which objection was overruled. Defendant's counsel stated "We stand by our tendered instructions as to the substantive offense...." The district court then agreed to give the first paragraph of defendant's tendered instruction number two, regarding the intent to defraud. The court then inquired: "Anything else?" and defendant's counsel responded: "No, your Honor, we did not have any other objections."
 
 
 63
 The record, thus, indicates that all counsel were aware of the trial court's proposed instructions, and that defendant's counsel were given ample opportunity to object to the court's proposed instructions or to request additional instructions. Defendants' attorneys never made any motion or request to the district court to give the entrapment instruction either at the close of the evidence on the first day of trial, or at the Rule 30 conference (whether formal or informal) that occurred on the second day of trial immediately before the court instructed the jury and closing arguments were given. Moreover, defendant's attorneys never raised the entrapment instruction issue before the jury retired to consider its verdict, as required by Federal Rule of Criminal Procedure 30, and the district court was never asked to consider whether any evidence of entrapment was produced.
 
 
 64
 Plain error did not occur because defendant produced no evidence of non-predisposition to commit the offense. The evidence indicated that the plan for defendant to provide counterfeit money for a drug transaction was formulated long before Special Agent Helminski became involved or Langley agreed to cooperate with the United States. For this reason, there was no plain error, which is one that "seriously affects the fairness, integrity or public reputation of judicial proceedings." Young, 470 U.S. at 15.
 
 V.
 
 65
 To conclude, the judgment of the district court is hereby AFFIRMED.